No. 47,313

WILLA BEARD, *Appellant,* v. MONTGOMERY WARD AND COMPANY, *Appellee.*

(524 P. 2d 1159)

Opinion filed July 17, 1974.

*Ronald C. Newman,* of Weeks, Thomas, Lysaught, Bingham and Mustain, Chartered, of Kansas City, argued the cause, and *James P. Zakoura,* of the same firm, was with him on the briefs for the appellant.

*James N. Snyder,* of Snyder and Snyder, of Leavenworth, argued the cause, and *James N. Snyder, Jr.,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: This is an action to set aside a 1966 sheriff's deed, issued on execution against forty acres of land near Tonganoxie formerly owned by the plaintiff, Willa Beard. The trial court found she had no homestead exemption and refused to set aside the deed. It also overruled her post-trial motions for a new trial and to set aside the judgment, and plaintiff appeals.

In her petition, filed September 23, 1969, plaintiff's claim of a homestead exemption was based on a simple allegation that she was the owner and lived on the property on December 30, 1960. That was the day Montgomery Ward and Company, the defendant in this suit, filed an action against her on an open account. She made no defense to that action, and default judgment was entered against her in due course for $1,307.56, plus interest and costs. It is agreed that the lien of that judgment, under which the land was sold, attached on the first Monday in January, 1961.

Montgomery Ward apparently made no further collection efforts until November 9, 1964, when it caused plaintiff to appear in district court for examination as a judgment debtor. She testified that she was then living alone, and made no effort to correct counsel's statement that she was a single woman. When it appeared she had no money in any bank, counsel announced that he intended to have the sheriff levy on the 40 acres. He did just that, and the levy was made nine days later. The following June the sheriff advertised the property for sale, and Montgomery Ward bought it at the sheriff's sale on July 6, 1965. The sheriff's return indicates that from the proceeds he paid back taxes on the place for 1961, 1962, 1963 and 1964. The sale was confirmed July 29, 1965, with the redemption time fixed at one year. On September 30, 1966, the challenged sheriff's deed was issued. It was recorded December 7, 1967.

To establish a homestead it was incumbent upon plaintiff to show that the property was, at least at some time, "occupied as a residence by the family of the owner." (K. S. A. 60-2301; Kan. Const., Art. 15, § 9.) There was never any question but that she was the "owner" of the land when the judgment lien attached. She had purchased it in April, 1958, taking a deed in the name of "Willa Beard" and giving back a purchase money mortgage in which she was described as "a single woman." Her difficulty throughout the lawsuit lay in

her efforts to establish that any member of her "family" ever "occupied" the land as a "residence."

On February 7, 1970, some four and one-half months after this suit was filed, plaintiff's first deposition was taken. (It was later introduced into evidence at trial.) In that deposition she testified that from at least the time she bought the farm in 1958 until some time in 1960 she had lived there in a husband-wife relationship with a William H. Barker. Although there had never been a ceremonial marriage, she frequently went by "Willa Barker," or "Mrs. William H. Barker," as well as by "Willa Beard," her maiden name. She had, it seemed, been married at least three times previously, although she could not at the time recall the name of any of her husbands. She was fairly confident that each of these marriages had been dissolved, although she was uncertain as to how, when or where the dissolutions had taken place. (Barker, it later developed, was legally married to someone else during this entire period; he had been married in 1948 and was divorced from his legal wife in the same district court in 1963.)

It also appeared that between the time she was served with process in the Montgomery Ward suit on January 9, 1961, and the time the default judgment was entered on January 31, 1961, she executed two separate deeds to the property. The first, on January 23, was a warranty deed to herself and her mother as joint tenants. The second, on January 26, quit-claimed her interest to her mother. She signed each as "Willa Beard," and in the first deed was described as "a single woman." Both deeds, of course, post-dated the judgment lien.

After this deposition was taken nothing further happened in the case for a year and a half until, in August, 1971, plaintiff's counsel was permitted to withdraw.

Despite such withdrawal counsel again made an appearance for plaintiff at the pre-trial conference on October 13, 1971. There, for the first time so far as the record shows, plaintiff claimed the homestead exemption to be based on her relationship with a George Fugett. Any claim of a common law marriage to Barker was specifically abandoned, and her first factual contention was specified as:

"a. Plaintiff legally married to George Fugett on September 26, 1958, in Vallejo, California, the marriage license being obtained in Fairfax, Solano County, California. They are still legally married."

Her petition was amended by interlineation to reflect her new claim.

In the pre-trial order details of her three prior marriages and divorces were set forth, and she assumed the burden of producing at trial all four marriage certificates, plus decrees of divorce from the first three husbands.

The crucial stipulations in the pre-trial order were those limiting the issues:

"6. The issues of fact are:
    a. Was plaintiff single or married on the first Monday in January, 1961?
    b. Was plaintiff living alone on the first Monday in January, 1961, or was George Fugett living with her as her husband?
"7. Question of Law: Was this property the homestead of plaintiff on the first Monday in January, 1961?"

With the issues so framed the case went to trial a year later, in December, 1972. (In the meantime a second deposition of plaintiff was taken, which was also admitted into evidence at trial.) Marriage certificates for the three prior marriages were produced, but none as to Fugett. As to that marriage she testified that she went to California in September, 1958, married him on the 26th in Vallejo, spent one night with him at a motel in an unknown city, and promptly returned to Tonganoxie and the waiting Barker.

Fugett, it seems, was some type of sergeant in one of the armed forces—she didn't know which one—and went overseas again shortly after the marriage. She didn't see him again for six months or a year, *i. e.,* until mid to late 1959. In her deposition she said he returned to the Kansas City-Lawrence-Tonganoxie area for a few nights, and she thought he might have spent a night or two at the farm at that time. At trial she said he spent a month with her. In neither version was there any explanation as to what she might have done with Barker, who was still living on the farm with her and continued to do so until the spring of 1960.

According to plaintiff, Fugett again went overseas, to France, Korea or Japan, but by great good fortune returned to Tonganoxie in December, 1960, and stayed on into January, 1961. This, of course, was just the time that Montgomery Ward was suing her (as "Willa Beard, also known as Mrs. William H. Barker, a/k/a Mrs. Wm. H. Barker.") It was also the time when she was executing the two deeds to her mother as "Willa Beard."

After this stay, she said, Fugett again went overseas, and their contacts were only intermittent until 1966, when they parted for good.

The defendant produced three neighbors, the undersheriff, and

the scrivener of the two deeds to plaintiff's mother, each of whom knew plaintiff only as "Willa Beard." None had ever heard of a George Fugett. A long-time employee of the telephone company testified that prior to 1962 service at plaintiff's farm was under the name of "Willa Beard." In 1962, the listing was changed to "Mrs. Wm. H. Barker." The 1962 Tonganoxie telephone directory showing that listing was admitted into evidence. (Barker, it may be recalled, had been gone for two years by then.) It was not until August 23, 1971, that the name "Fugett" first appeared in the town of Tonganoxie, when plaintiff requested service in that name. She took that action just after her trial counsel first withdrew from the case after it had been pending almost two years, and less than two months before the pre-trial conference at which the claimed marriage to Fugett was first officially asserted.

After taking the matter under advisement the trial court filed a memorandum opinion on December 18, 1972, making the following critical finding:

"It is the finding of this Court that plaintiff was a single person on the first Monday in January, 1961. The only evidence presented by plaintiff to establish her alleged marriage to one George J. Fugett was her oral testimony, which this Court concludes must be rejected. However, it is also the conclusion of this Court that, *even if said marriage had been established, the evidence presented by plaintiff falls far short of establishing that the real estate in question was occupied as a residence by the family of the owner* as required by the provision of K. S. A. 60-2301." (Emphasis added.)

Judgment for defendant was entered accordingly. At this juncture new counsel entered the case for plaintiff and attempted a salvage operation. After securing an ex parte order extending the time to do so, counsel filed a motion for a new trial. At the same time he filed a motion under K. S. A. 60-260 (*b*) to set aside the judgment. Both motions alleged in substance that plaintiff had no reason to think the court would disbelieve her testimony about marrying Fugett, and that since the trial she had acquired a certified copy of the marriage certificate. She also tendered "newly discovered" evidence of an occasion in 1964 when she had used the name "Willa E. Fugett" in a hospital admission. The hospital records showed that she had told the attending physician her husband was in the service in California, and that they had been separated for one year. In addition, she alleged for the first time in her post-trial motions that there were notice deficiencies in the original 1961 judgment, the 1964 levy and the 1965 execution sale

which deprived her of her property without due process of law.

The trial court concluded that it had exceeded its authority in extending the time for the motion for new trial, but considered and denied both motions on the merits. The present appeal encompasses those rulings as well as the judgment itself.

On appeal plaintiff first contends that the trial court was bound to believe her testimony concerning her marriage to Fugett because it was not directly contradicted. This is not the law; the trier of fact is the sole judge of the credibility of a witness. While it "cannot arbitrarily or capriciously refuse to consider the testimony of any witness, . . . it is not obliged to accept and give effect to any evidence which, in its honest opinion, is unreliable, even if such evidence be uncontradicted." (*Collins v. Merrick,* 202 Kan. 276, 448 P. 2d 1, Syl. ¶ 3. See also, *Lehigh, Inc. v. Stevens,* 205 Kan. 103, 468 P. 2d 177; *In re Estate of Johnson,* 155 Kan. 437, 125 P. 2d 352.)

In this case, however, it is immaterial whether plaintiff was married to Fugett or not. The fatal finding by the court was that, even if she was married, she had not established that the real estate "was occupied as a residence by the family of the owner." Assuming Fugett was plaintiff's "family," there was only plaintiff's word that he had ever "occupied" the land. Her testimony was that *Barker* was occupying the land as her husband at the time she claimed Fugett first visited her. Also, in her first deposition she was asked who had lived with her between 1958 and 1961. She named Barker, her sister and the sister's children, and her mother, at various times; she never mentioned Fugett. On this basis the trial court might well have found that Fugett was never there at all.

But that is not all. Even if Fugett *was* there, he must have occupied the land as his "residence." In our law that term means "domicile," or "the place adopted by a person as his place of habitation, and to which, whenever he is absent, he has the intention of returning." (K. S. A. 77-201, *Twenty-third.* See, *Estate of Schoof v. Schoof,* 193 Kan. 611, 396 P. 2d 329.) Plaintiff's testimony was that each time Fugett came to the farm he brought his things in a suitcase and each time he left he took everything he brought with him. The only things he ever left at the farm were some pictures and letters—all his belongings, including his whiskey and his clothes, went with him when he left. Such conduct is wholly inconsistent with an intent on his part to make the farm his permanent

residence. He was more of a casual visitor. Compare, *State, ex rel., v. Jones,* 169 Kan. 521, 219 P. 2d 706; *Arnette v. Arnette,* 162 Kan. 677, 178 P. 2d 1019.

On this issue the trial court made a negative finding that plaintiff had not sustained her burden of proof. On the record presented that finding is conclusive on appeal. *Short v. Sunflower Plastic Pipe, Inc.,* 210 Kan. 68, 500 P. 2d 39; *Union National Bank & Trust Co. v. Acker,* 213 Kan. 491, 516 P. 2d 999; *Noel v. Noel,* 212 Kan. 583, 512 P. 2d 324.

Since proof of the marriage would not change the result, the belated production of the marriage certificate and the 1964 hospital record are immaterial, and would furnish no basis for a new trial or for setting aside the judgment.

There remains the question of the procedural deficiencies in the original 1961 action. In our opinion plaintiff raised them too late. They were not pleaded, and were not mentioned in the pre-trial order. They were not in issue at the trial, and the trial court naturally did not pass on them. The issues tried, by stipulation of the parties, were "marriage" and "homestead."

The purpose of the pre-trial order is to define and clarify the issues, and it controls the course of the trial unless subsequently modified (K. S. A. 60-216; *Tillotson v. Abbott,* 205 Kan. 706, 472 P. 2d 240; *Freeto Construction Co. v. American Hoist & Derrick Co.,* 203 Kan. 741, 457 P. 2d 1; *Bender v. Bulger Cadillac-Oldsmobile, Inc.,* 208 Kan. 72, 490 P. 2d 361.) As we have said, "It is also a general rule that a court will not grant a new trial for insufficient reasons merely to give a party an opportunity to shift his ground of action or defense. If a case has been tried upon one theory it is too late to mend his hold and advance another theory which might have been but was not presented at the trial." (*Mallows v. Mallows,* 93 Kan. 551, 556, 144 Pac. 829, See also, *Dixon & Ebert Co. v. Hicks,* 181 Kan. 953, 317 P. 2d 407; *U. P. Rly. Co. v. Springsteen,* 41 Kan. 724, 21 Pac. 774. And cf., *Evangelist v. Bellern Research Corporation,* 199 Kan. 638, 639, 433 P. 2d 380, and cases cited.)

Finally, plaintiff suggests that if our homestead exemption law fails to grant her, as a single person, the same benefit afforded to those with families, it is unconstitutional as denying her the equal protection of the laws. It establishes, she says, an unreasonable classification. This point, too, was never presented until the trial was over, and it is without merit. "The constitutional safeguard is

offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." (*McGowan v. Maryland,* 366 U. S. 420, 425, 6 L. Ed. 2d 393, 81 S. Ct. 1101. See also, *Henry v. Bauder,* 213 Kan. 751, 518 P. 2d 362.) Here the state's objective is twofold, the primary being the protection of the *family* of the debtor. *Iowa Mutual Ins. Co. v. Parr,* 189 Kan. 475, 370 P. 2d 400. The second aspect was recognized in the early days of statehood, when this court said, "It was not established for the benefit of the husband alone, but for the benefit of the family and of society—to protect the family from destitution, and society from the danger of her citizens becoming paupers." (*Morris v. Ward,* 5 Kan. 239, 244.) To achieve this dual objective Kansas has created its constitutional and statutory exemptions in favor of those debtors who have families requiring protection, and whose families would swell the welfare rolls if destitute. The state and federal statutes abound with laws treating families differently from individuals. Not to labor the point, we think the classification an entirely reasonable one.

The judgment is affirmed.

APPROVED BY THE COURT.

FROMME, J., not participating.