(609 P.2d 188)
No. 51,292

THE SEKAN ELECTRIC COOPERATIVE ASSOCIATION, INC., *Applicant,* v. STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, Richard C. Loux, Chairman, William S. Gray, Commissioner, *Respondent.*

Opinion filed March 21, 1980.

*James M. Caplinger,* of James M. Caplinger, Chartered, of Topeka, for the applicant.

*Curtis M. Irby,* assistant general counsel, Kansas Corporation Commission, for the respondent.

Before FOTH, C.J., ABBOTT and PARKS, JJ.

FOTH, C.J.: The Sekan Electric Cooperative Association, Inc., is a non-profit corporation engaged in the distribution of electricity to some 3900 member-customers in southeast Kansas. In November, 1978, it filed an application with the Kansas Corporation Commission for a rate increase to produce an additional $248,379 in operating revenues. The Commission fixed a rate of return which would produce only an additional $18,751. Sekan has sought judicial review, contending that the Commission's order (1) excluded a portion of its equity capital from its rate base; (2) improperly prevents it from recovering its capital costs; and (3) arbitrarily rejected its proposed rate structure.

In examining these contentions we must bear in mind the limitations on our scope of review, recently recapitulated in *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 380-81, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979):

"K.S.A. 1978 Supp. 66-118d limits judicial review of an order by the commission to determining whether the order is 'lawful' or 'reasonable.' *Kansas Gas & Electric Co. v. State Corporation Commission,* 218 Kan. 670, Syl. ¶ 1, 544 P.2d

1396 (1976). A court has no power to set aside such an order unless it finds that the commission acted unlawfully or unreasonably. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, 396-7, 565 P.2d 597 (1977). An order is 'lawful' if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. 505, Syl. ¶ 1, 561 P.2d 779 (1977). An order is generally considered 'reasonable' if it is based on substantial competent evidence. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, Syl. ¶ 2.

"The legislature has vested the commission with wide discretion and its findings have a presumption of validity on review. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. at 511. Since discretionary authority has been delegated to the commission, not to the courts, the power of review does not give the courts authority to substitute their judgment for that of the commission. *Central Kansas Power Co. v. State Corporation Commission,* 206 Kan. 670, 675, 482 P.2d 1 (1971). The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into fixing utility rates. It is aided by a staff of assistants with experience as statisticians, accountants and engineers, while courts have no comparable facilities for making the necessary determinations. *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 48-9, 386 P.2d 515 (1963). Hence a court may not set aside an order of the commission merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it. *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 617, 538 P.2d 702 (1975); *Graves Truck Line, Inc. v. State Corporation Commission,* 215 Kan. 565, Syl. ¶ 5, 527 P.2d 1065 (1974)."

## I.

The Commission's order fixed a rate of return, after operating expenses, of 3.43% on a total rate base, as adjusted, of $3,170,310. This assumed that, in line with Sekan's past practice, none of the net proceeds would be used to repay capital previously contributed by member-customers through paying rates in excess of the cost of service. (Systematic repayment of some of these "capital credits" of members each year is called "capital credit rotation.") The Commission also gave Sekan the option to demonstrate within sixty days that it intended to commence a capital credit rotation plan, in which case the rate of return would be increased to 4.81%. Sekan chose not to avail itself of this option, and the 3.43% rate went into effect.

The Commission's findings on the rate issue were based on the testimony of economist Jack T. Blakley, and a rejection of testimony offered by Sekan. Its reasoning is demonstrated by the following excerpt from its order:

"Mr. Blakley derived his 4.81% recommended rate of return by using a methodology that considered a return on equity, recovery of interest on funded debt, and the need for an electric cooperative to achieve a satisfactory times interest earned ratio (TIER). Mr. Blakley calculated the return on equity from a formula that takes into account the period of rotating capital credits designed by the cooperative and an anticipated rate of growth in total capitalization. Mr. Blakley's alternative rate of return, exclusive of an allowance for capital credit rotation, is 3.43% and represents the return Applicant needs to pay its interest obligations and provide a target TIER of approximately 2.25.

"The Commission finds that Applicant's requested rates of return overstate the Company's return requirements. Rate of return is supposed to provide for a return of equity and for cash to meet interest obligations. It is not designed to provide cash for repayment of debt principal or to offset the uncertain effect of inflation on operating and maintenance expenses. Mr. Glassman's testimony regarding the 10.50% rate of return on equity being less than the return allowed a publicly-owned utility, is not relevant to this proceeding. Equity in a electric cooperative represents the sum of members' mandatory payments in excess of all expenses, including interest expense."

It may be seen that the Commission did not "exclude" part of Sekan's equity capital. It simply adopted a rate to be applied to the entire rate base which allowed no "return" on equity, in the usual sense of corporate profits, at all. This result is justified by the fundamental difference between cooperatives and profit-making utilities. Cooperatives, unlike investor-owned utilities, do not secure equity by stock offerings in the marketplace, but by "overcharging" their customers and placing the surplus in their capital account. Hence a return large enough to pay dividends is not required to attract equity capital or to make a cooperative financially sound; it is enough that its rates safely cover its interest obligations to the federal lending agencies which furnish its long term debt capital (the "TIER" referred to by Blakley and in the order). The rate approved by the Commission meets this objective.

Sekan's argument about excluding part of its rate base is aimed primarily at the Commission's economist Blakley, who referred in his testimony to a "hypothetical equity ratio" of about 35%. It is conceded that Sekan's actual equity is about 55%, with the remaining 45% of its capital being long term debt. In computing an overall rate of return it is common to compute one rate on equity and a different rate on debt, and then allow a weighted average. That was done by Mr. Blakley in his alternative computation, but employing a hypothetical ratio rather than Sekan's actual ratio.

The authority of a commission to adopt a hypothetical equity ratio for rate of return purposes has been almost universally upheld in the courts. See E. Nichols, *Ruling Principles of Utility Regulation,* 267-273 (1955). The rationale was explained in E. Nichols and F. Welsh, *Ruling Principles of Utility Regulation, Rate of Return Supplement A,* 157 (1964):

"It must be kept in mind, of course, that the regulatory commission does not have the actual authority to *revise* a utility's capital structure, per se, or to order the utility to change it into a different setup. That is a prerogative of management which cannot be superseded by the substitution of regulatory opinion—that is to say, how much debt should be incurred or common stock issued.

"It is solely in the area of assuming what effect a different or more desirable capital structure would have on the cost of capital, *if it were adopted,* that the regulatory judgment may function. As a practical matter, of course, such a hypothetical assumption of an ideal or optimum capital structure, as distinguished from that which actually exists, may have the same dollars-and-cents results, as far as the return allowance is concerned, as an actual change in the capital structure. In other words, the regulatory authority may say to the utility company, in effect: 'We find that if the debt to equity ratio were different from what it actually is, your capital costs would be lower, so therefore we will consider the cost of capital just as if the capital structure were different, in making the return allowance.'

"This distinction between the function of management and that of the regulatory authority has been succinctly stated by the Maryland court of appeals in a recent decision [*C. & P. Tel. Co. v. Public Service,* 230 Md. 395, 187 A.2d 475 (1963)] wherein it was said that the owners and management of a utility have the right to determine what the debt-equity ratio should be, but they may not always make the ratepayers foot the bill resulting from the choice."

*Cf.* also *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 81-82, 386 P.2d 515 (1963).

There is, thus, authority and justification for Blakley's approach—which would have been applicable had Sekan chosen the offered option to rotate capital credits, but was not under the course chosen by the company.

Both Sekan and the Commission agree in principle that the repayment of capital credits contributed by the company's early customers is desirable and the fair thing to do so as to equalize the capital contributed by current customers. Sekan points out, however, that to do so without simultaneously retaining an equal amount of capital from current ratepayers will reduce its equity ratio below its present 55%. It argues two reasons why it should not do this. First, it says that under its mortgages if its equity ratio falls below 40% it will be contractually limited in the amount of

capital credits it may retire. That may be (although there is nothing in this record to support it), but the day that occurs appears to be some way down the road; there is no such *current* limitation. Second, it points to a 1964 Commission order which set out general guidelines for rural electric cooperatives. That order recognized the need for cooperatives to accumulate capital credits, and observed that in the utility industry in general "a utility is financially sound and can attract additional amounts of capital when needed if the ratio of indebtedness is approximately 50% of the total capitalization or not greatly in excess of 50% thereof. Therefore, it stands to reason, the effect on the debt ratio should be given consideration before any large amounts of patronage capital are distributed in cash."

As we read the 1964 order it imposed no hard and fast rule, but was largely aimed at meeting the problem presented by cooperatives which were repaying capital credits while showing capital deficits. Even under the 1964 order Sekan could begin a program of repaying capital. Additionally, although not explicitly overruling or modifying the 1964 order, the present order apparently and implicitly reflects a change in administrative philosophy. We know of no rule which prevents such a change. See *Warburton v. Warkentin,* 185 Kan. 468, Syl. ¶ 4, 345 P.2d 992 (1959). We certainly cannot say it is unreasonable.

In sum, Sekan's argument on this issue is aimed at the "building blocks" used to construct the ultimate rate allowed, rather than at the rate itself. The appropriate judicial response to that kind of argument was established in the leading case of *Power Comm'n v. Hope Gas Co.,* 320 U.S. 591, 602, 88 L.Ed. 333, 64 S.Ct. 281 (1944):

"Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. [Citations omitted.] It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important."

Under this test, ignoring the claimed infirmities in the Commission's mathematical formulae, since the rate adopted meets the legitimate needs of the company, it is not subject to further judicial inquiry.

## II.

Sekan's second argument is that the rate allowed does not allow

for the "capital costs of its business." By this term it apparently means not only repayment of its long term debt but rotation of its members' capital credits.

Capital credit rotation has been discussed above. Our analysis of Sekan's cash flow figures reveals that if, as the Commission's order quoted above suggests, projected payroll increases and anticipated inflationary effects on operating expenses are charged to operating expenses rather than "rate of return," and if cash generated by depreciation entries and nonoperating revenues is added in, it will have adequate cash to refund *some* capital credits even under the lower rate it opted to accept. We note that capital credits *increased* over $100,000 per year in 1976 and 1977, and over $127,000 during the test year ending June 30, 1978.

As to repayment of debt, we find prominent authorities in the utility field making this observation:

"Some mention must be made of debt-retirement problems for utilities, since debt plays such a large part in utility financing. Although there is still some argument over whether long-term debt is temporary or permanent capital, it seems to be pretty well accepted that it usually plays the role of permanent capital. What this means is that, rather than retiring debt in any large quantities, utilities refinance it, issuing a new debt issue to replace an old one." Garfield and Lovejoy, *Public Utility Economics*, 421 (1964).

The Commission rejected the idea that long term debt should be repaid out of rate of return, or "operating margin," suggesting instead that it be either refinanced or paid from depreciation cash if that source is not to be used to rotate capital credits. Sekan offers no authority saying the Commission's position is unreasonable, and we see nothing to compel such a conclusion on our part.

### III.

For its rate schedule Sekan proposed to retain its declining block rate structure whereby the more electricity a customer uses the less he pays per kilowatt hour. The increased rates sought would be spread by increasing each block rate by an equal percentage. The Commission found Sekan's evidence on this issue unpersuasive. Specifically, it found the testimony contradictory as to which costs—customer, fixed, operating, or energy—were to be recovered by each rate block. It therefore ordered Sekan to fix a customer or minimum bill charge, augmented by a flat kilowatt hour charge for all electricity used.

Sekan contends that the Commission cannot have found that it

failed in its burden of proof as to the rate structure when Sekan's witness provided the only evidence as to rate structure. A similar issue was considered in *Central Maine, Etc. v. Public Utilities Com'n,* 405 A.2d 153 (Me. 1979). There the Commission rejected the utility's cost of service study as flawed and discarded declining block rates. In discussing the allocation of rate increases to the various classes of customers the court stated:

> "We may initially conclude that the Commission staff's failure to present a direct case on the proper allocation of the revenue increase among the rate classes does not constrict the Commission's freedom of decision. Even the uncontradicted evidence of the utility may be weighed, critically examined, and rejected if deemed necessary." 405 A.2d at 186.

See also *PSC v. Continental Tel. Co.,* 94 Nev. 345, 348, 580 P.2d 467 (1978), where the conceded and accepted rule was said to be:

> "The commission is not bound to accept as true unrebutted expert evidence if such evidence lacks credibility. *See* State v. Public Service Commission, [359 Mo. 109], 220 S.W.2d 61 [1949]; New Haven Water Co. v. Connecticut Public Utilities Comm'n, [30 Conn. Sup. 149], 305 A.2d 863 [1972]."

This follows the general rule of evidence, recognized in Kansas that:

> "The trier of fact is the sole judge of the credibility of a witness. While it cannot arbitrarily or capriciously refuse to consider the testimony of any witness it is not obligated to accept and give effect to any evidence which, in its honest opinion, is unreliable, even if such evidence is uncontradicted." *Beard v. Montgomery Ward & Co.,* 215 Kan. 343, Syl. ¶ 1, 524 P.2d 1159 (1974).

The rate design adopted here accords with the Commission's apparent policy of "flattening" schedules of rates to be charged for energy. See *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d at 389. This kind of policy decision is legislative in nature, to be exercised by the Commission under legislative mandate. It demands utmost deference from the judicial branch.

The Commission did make reference to the Public Utility Regulatory Policies Act, 16 U.S.C. § 2601 *et seq.,* a federal enactment concededly not applicable to Sekan. We take the reference to be mere argument in support of the Commission's policy against declining block rates, and not as an "application" of that Act to Sekan.

It is apparent that in light of national and state policy concerns

with regard to energy conservation, the Commission weighed Sekan's evidence as to declining block rates and found it wanting. Even though that evidence was not opposed by direct counter evidence, the Commission could properly find that Sekan had not met its burden of showing its proposal to be "just and reasonable." *Cf. Southwestern Bell Tel. Co. v. Kansas Corporation Commission,* 4 Kan. App. 2d 44, 602 P.2d 131 (1979), *rev. denied* 227 Kan. _____ (1980).

The order of the Commission is affirmed.