KANSAS GAS AND ELECTRIC COMPANY, *Applicant/Appellant*, v. STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Respondent/Appellee.*

No. 58,917

KANSAS CITY POWER & LIGHT COMPANY, *Applicant/Appellant*, v. STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Respondent/Appellee.*

No. 58,918

KANSAS ELECTRIC POWER COOPERATIVE, INC., *Applicant/Appellant*, v. STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Respondent/Appellee.*

(720 P.2d 1063)

Opinion filed June 13, 1986.

*James Haines* and *Jonathan L. Heller*, of Wichita, and *Edgar M. Roach, Jr.*, of Hunton & Williams, of Raleigh, North Carolina, argued the cause, and *Ralph Foster*, of Wichita, *Richard D. Gary* and *Laurence E. Skinner*, of Hunton & Williams, of Richmond, Virginia, and *Thomas E. Graham*, of the same firm, of Raleigh, North Carolina, were with them on the briefs for appellant Kansas Gas and Electric Company.

*Lowell L. Smithson*, of Spencer, Fane, Britt & Browne, of Kansas City, Missouri, argued the cause, and *Russell W. Baker, Jr.* and *Curtis E. Woods*, of the same firm, *Charles S. Schnider*, of the same firm, of Overland Park, and *Warren B. Wood*, of Overland Park, were with him on the briefs for appellant Kansas City Power and Light Company.

*Clifford L. Bertholf* and *John Philip Kassebaum*, of Kassebaum & Johnson, of Wichita, argued the cause and were on the briefs for appellant Kansas Electric Power Cooperative, Inc.

*Brian J. Moline*, general counsel, and *Donald A. Low*, director of utilities, argued the cause, and *LuAnn C. Dixon*, *John Jay Rosacker*, *Robert L. Bezek, Jr.*, and *Richard Hird*, assistants general counsel, were with them on the brief for appellee Kansas Corporation Commission.

*Patrick H. Donahue*, of Kansas Legal Services, Inc., of Topeka, argued the

cause, and *William G. Riggins,* of the same organization, was with him on the brief for intervenor Mary Margaret Rogers.

*Robert T. Stephan,* attorney general, and *Carl M. Anderson,* assistant attorney general, were on the brief for intervenor Office of the Attorney General.

*Robert Vinson Eye,* of Irigonegaray, Eye & Florez, of Topeka, was on the brief for intervenor Alliance for Liveable Electric Rates (ALERT).

*Dwight A. Corrin,* of Corrin & Krysl, Chartered, of Wichita, was on the brief for intervenor Electric Shock Coalition.

*John Dekker,* city attorney, and *Joe Allen Lang,* assistant city attorney, were on the brief for intervenor City of Wichita and Cities of Cheney, Clearwater, Derby, Garden Plain, Goddard, Kechi, Potwin and Whitewater.

*C. Edward Peterson,* of Perry & Hamill, of Overland Park, was on the brief for intervenor Johnson County Joint Intervenor Group.

The opinion of the court was delivered by

PRAGER, J.: This is a consolidation of three appeals by three electrical utilities from orders of the State Corporation Commission (KCC) granting in part and denying in part the requests of the utilities for rate increases due to the commercial operations of the Wolf Creek Generating Station (Wolf Creek) near Burlington, Kansas. The three utilities are Kansas Gas and Electric Company (KGE), Kansas City Power and Light Company (KCPL), and Kansas Electric Power Cooperative, Inc. (KEPCo). The KCC is the appellee. There are also a number of intervenors, including the Kansas Attorney General and various individuals and organizations representing interested citizens and the public.

## Historical Background

The legal issues presented in this case are not peculiar to Kansas but are the natural result of the national controversy over the construction of nuclear power plants which has developed over the past thirty years. On December 8, 1953, in his address to the United Nations, President Dwight D. Eisenhower announced his "Atoms for Peace" program. Among other subjects, he spoke of using the atom "to serve the peaceful pursuits of mankind." He spoke of providing abundant electrical energy in the power-starved areas of the world and envisioned the cooperation of the nations of the world to serve the needs rather than the fears of mankind. The possibility that nuclear energy could be used to improve rather than to destroy the world excited most Americans. Today, three decades later, the future of nuclear

power is uncertain and the national debate has not been resolved.

In 1953, the Atomic Energy Commission, an agency created by Congress to supervise atomic energy and its development, allocated funds for a demonstration nuclear plant at Shippingport, Pennsylvania. The reactor used in that plant was very small and, by modern standards, its output of electricity was very modest. During the 1960s, several private companies developed nuclear reactors and marketed them to utilities at prices competitive with conventional generators. Between 1965 and 1975, the nuclear industry was perhaps the fastest growing major industry in the United States.

During the 1960s, KGE used natural gas to generate its electricity. Some time during the late 1960s, KGE was notified by its natural gas supplier that the utility's access to natural gas eventually would end. At that time, KGE was experiencing a growth in demand for electricity of approximately seven percent per year. KCPL, an electrical utility in northeast Kansas, was experiencing the same growth in demand. Both utilities, like many others around the country, faced the decision of whether to generate electricity from coal or from natural gas or from nuclear power. Studies were commissioned which suggested that nuclear power rather than coal or natural gas was the most cost efficient and environmentally sound alternative for expansion of electrical capacity. As a result, KGE and KCPL, and later KEPCo, decided to take the nuclear route. KGE and KCPL each took 47% shares in the project, and KEPCo took a 6% share.

In January of 1977, the Nuclear Regulatory Commission (NRC), the successor to the Atomic Energy Commission, issued a temporary work authorization permit for the construction of a nuclear facility on Wolf Creek in Coffey County. In May of 1977, major construction work began. It was estimated in February of 1973 that the cost of constructing the nuclear plant at Wolf Creek would be in the neighborhood of $525,000,000. The ultimate cost of construction amounted to about $3,000,000,000, almost a sixfold increase.

It is clear that three unforeseen events occurred during the mid-1970s which affected the relative attractiveness of the nuclear option and brought about a tremendous increase in the cost of construction. After several nuclear power plants were con-

structed, a series of accidents occurred which intensified the debate over the use of nuclear energy. At the Three Mile Island accident in March 1979, a mechanical malfunction, compounded with human errors, brought the Three Mile Island nuclear reactor close to a meltdown. This required the utilities to increase their efforts to improve plant safety. New safety equipment, which the NRC required, added millions of dollars to the costs of nuclear plant construction at Wolf Creek and elsewhere.

Another important factor was the change in "energy economics" that occurred during the 1970s. When OPEC in 1973-74 raised the price of oil, making nuclear power even more attractive, orders for nuclear reactors increased. A second oil shock occurred in 1979 when, following the overthrow of the Shah of Iran, the price of oil reached $40 per barrel. The American people responded to the oil crisis and an unexpected and dramatic decline in the demand for oil followed. The demand for energy also diminished. Electrical utilities, which had already implemented plans to substantially increase their supply of electricity, now discovered that the supply greatly exceeded the demand for electricity. Some utilities responded to this new economic environment by canceling plans for additional generating facilities including scheduled nuclear plants, some of which were then under construction.

A third unforeseen development which the utilities faced in the construction of nuclear plants was the increased inflation of the 1970s, the effect of which was to increase substantially the cost of building a nuclear plant. By adding millions to interest costs, cost overruns strained the cash flow positions of some utilities and thus impeded the ability of some utilities to raise capital to complete these projects. All of these unforeseen changes affected the Wolf Creek project. The project was delayed both by the post-Three Mile Island safety standards and construction problems which developed at the site. Although the original plans called for the Wolf Creek plant to start producing electricity in April 1981, production did not commence until September 1985. There is an excellent discussion of this historical background in an article by Professor Robert H. Jerry, II, entitled *Introduction to Wolf Creek Symposium,* 33 Kan. L. Rev. 419 (1985).

As the time for commencement of operations at the Wolf Creek

plant approached, the three utilities involved in this case filed petitions with the KCC requesting the granting of appropriate electrical rates for the electricity to be produced. At this same time, regulatory agencies in other states were faced with the same or similar problems. In some states, state regulatory agencies had to determine whether the costs of an abandoned nuclear plant should be included in an electrical utility's rate base. Where a nuclear plant had been completed and placed in operation, the state regulatory agency had the problem of determining whether the inflated construction costs of a nuclear facility had to be included in the rate base in a manner which would financially hurt the ratepayers, the consumers, and the general public. It is this same basic problem which was faced by the KCC in the case now before us.

## Constitutional and Legal Principles Applicable in Rate-making Decisions.

Before turning to the specific issues raised in this case, it would be helpful to discuss some of the general constitutional and legal principles applicable to rate-making decisions by state regulatory agencies. An important question to be considered is what a regulatory agency should seek to accomplish in such a case. The leading cases in this area clearly indicate that the goal should be a rate fixed within the "zone of reasonableness" after the application of a balancing test in which the interests of all concerned parties are considered. In rate-making cases, the parties whose interests must be considered and balanced are these:

(1) The utility's investors vs. the ratepayers;
(2) the present ratepayers vs. the future ratepayers; and
(3) the public interest.

The leading case in this area which has been followed by various state regulatory agencies is *Power Comm'n v. Hope Gas Co.*, 320 U.S. 591, 88 L. Ed. 333, 64 S. Ct. 281 (1944). The issue presented in *Hope* was whether there was a requirement of constitutional dimension that utility rates set by regulatory authorities be set at sufficiently high levels to *guarantee,* irrespective of countervailing consumer interests, the continued financial integrity of the utilities concerned. Stated in another way, is a public utility entitled in every case to a reasonable return on its capital investments as a matter of law without regard to the interests of

the ratepayers and consumers? In *Hope*, the United States Supreme Court addressed the considerations to be taken into account by the Federal Power Commission in setting "just and reasonable" rates for natural gas companies, as required by § 4(a) of the Natural Gas Act of 1938, 15 U.S.C. § 717 (1982). In applying the standard requiring "just and reasonable" rates, the *Hope* court emphasized that the focus of inquiry is properly upon the end result or "total effect" of the rate order, rather than upon the rate-setting method employed. The court described the rate-setting process as a balancing process involving the weighing of certain enumerated interests of the consumer and of the investor. The court stated that the rate-making process involves a balancing of the investor and the consumer interests, and that public utility regulation does not insure that the business shall produce net revenues.

The decision in *Hope* was followed by *Permian Basin Area Rate Cases*, 390 U.S. 747, 770, 20 L. Ed. 2d 312, 88 S. Ct. 1344, *reh. denied* 392 U.S. 917 (1968), which held that the "just and reasonable" standard of the Natural Gas Act coincides with the applicable constitutional standards and any rate selected by a regulatory commission within the "broad zone of reasonableness" cannot properly be attacked as confiscatory.

There is an excellent discussion of these cases in *Pennsylvania Elec. v. Pennsylvania Pub. Util.*, _____ Pa. _____, 502 A.2d 130 (1985), where the Supreme Court of Pennsylvania had before it an appeal in an electrical utility rate case involving a nuclear generating plant which had been so severely damaged as to render it no longer useful in the public service. The question was whether the costs associated with the damaged nuclear plant should be removed from the rate base of the utilities. The court concluded that the Pennsylvania commission was not precluded from eliminating from the utility's rate base all costs associated with the unit of the nuclear power plant involved in a near meltdown or in determining that another unit which had previously been shut down for refueling and which remained shut down by order of NRC likewise was no longer useful in public service because its return to service was not imminent or certain. The court held that the decisions of the United States Supreme Court in *Hope* and *Permian Basin Area Rate Cases* did not establish, as a constitutional requirement, that the end result of a

rate-making body's adjudication must be the setting of rates at a level that will, in any given case, guarantee the continued financial integrity of the utility. Rather, *Hope* requires only that the regulatory authority balance competing consumer and investor interests to determine just and reasonable rates providing a return on used and useful property.

The Pennsylvania Supreme Court noted *In re: Jersey Central Power & Light Co.,* No. A-162-81T2 (July 28, 1983), *cert. den.* 95 N.J. 217, 470 A.2d 433 (1983), which involved similar facts and where a similar result was reached. An appeal was taken to the United States Supreme Court which was subsequently dismissed for want of a substantial federal question. *Jersey Central Power & Light Co. v. Board of Public Utilities of New Jersey,* 466 U.S. 947, 80 L. Ed. 2d 533, 104 S. Ct. 2146 (1984).

This balancing concept is supported by other federal court decisions. In *Smyth v. Ames,* 169 U.S. 466, 544, 42 L. Ed. 819, 18 S. Ct. 418 (1898), the Supreme Court stated that it cannot be admitted that a railroad corporation maintaining a railroad under the authority of the state may fix its rates with a view solely to its own interests, and ignore the rights of the public. *Washington Gas Light Co. v. Baker,* 188 F.2d 11, 19 (D.C. Cir. 1950), holds that the valuation included in the rate base must meet the test of justness and reasonableness to the consumer as well as to the investor. In *FPC v. Memphis Light, Gas & Water Div.,* 411 U.S. 458, 474, 36 L. Ed. 2d 426, 93 S. Ct. 1723 (1973), the Supreme Court expressly recognized that rates cannot be determined just and reasonable unless consumer interests are protected. In addition, a number of state courts have held that utility rates must not be set so high as to constitute an unreasonable burden on the ratepayers. *State, Ex. Rel. Allain v. Miss. Public Serv. Com'n,* 435 So. 2d 608, 624 (Miss. 1983); *New England Tel. & Tel. Co. v. Public Utilities,* 390 A.2d 8, 30 (Me. 1978); *Central Me. Power Co. v. P. U. C.,* 150 Me. 257, 278, 109 A.2d 512 (1954).

The Supreme Court of Kansas has likewise recognized and applied the "zone of reasonableness" concept in *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 386 P.2d 515 (1963). Syllabus ¶ 17 states as follows:

"There is an elusive range of reasonableness in calculating a fair rate of return. A court can only concern itself with the question as to whether a rate is so unreasonably low or so unreasonably high as to be unlawful. The in-between point, where the rate is most fair to the utility and its customers, is a matter for the State Corporation Commission's determination."

At page 58 of the opinion, the court recognizes the decision of the United States Supreme Court handed down in *Power Comm'n v. Hope Gas' Co.,* 320 U.S. 591, which is discussed heretofore. See also *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 5 Kan. App. 2d 653, 659, 623 P.2d 924, *rev. denied* 229 Kan. 670 (1981). All of these cases clearly support the general principle that a state regulatory agency, in setting a rate for a public utility, must have as its goal a rate fixed within the "zone of reasonableness" after an application of a balancing test in which the interests of all concerned parties are considered.

Kansas Statutory Provisions Applicable<br>to Rate-making Cases

Under the constitutional separation of powers doctrine, the regulation of public utilities is legislative in nature. The legislature created the Kansas Corporation Commission and granted it full and exclusive authority and jurisdiction to supervise, control, and regulate the public utilities of this state and, when acting in the exercise of its delegated powers, the Commission is not a quasi-judicial body. *Cities Service Gas Co. v. State Corporation Commission,* 201 Kan. 223, 440 P.2d 660 (1968); *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 5 Kan. App. 2d 653.

Thus, public utility rate making is a legislative function, whether it is regulated by an administrative body or by the legislature itself. Prior to 1984, the legislature empowered the KCC by broad, non-specific statutes to exercise the rate-making function. By K.S.A. 66-101, the State Corporation Commission was given the authority to supervise and control public utilities and was empowered to do all things necessary and convenient for the exercise of such authority. K.S.A. 66-141 (Weeks), now K.S.A. 66-101g, provided that the statutory provisions granting authority, power, and jurisdiction to the Commission shall be liberally construed. K.S.A. 66-107 (Weeks), now K.S.A. 66-101b, provided the KCC with authority to require a public utility to furnish reasonably efficient and sufficient service and to establish "just and reasonable" rates.

During the 1984 legislative session, the Kansas legislature was faced with the controversy over the Wolf Creek power plant. With estimates predicting that electric power bills would in-

crease from 40% to 110% when the plant became operational, the demand from consumer groups, the media, and even large business users to "do something" about Wolf Creek had created a political imperative. The result was the passage of House Bill 2927, codified as K.S.A. 66-128 through 66-128k, which substantially broadened and made more specific the statutory authority of the Commission in rate-making cases to address such issues as excess capacity, management inefficiency, and imprudence in the acquisition, construction, or operation of a generating plant. For an excellent discussion of the 1984 legislation see the article by Robert Vancrum, entitled *The Wolf Creek Excess Cost—Excess Capacity Bill*, 33 Kan. L. Rev. 475 (1985).

K.S.A. 66-128 authorizes the KCC to determine the reasonable value of "all or whatever fraction or percentage of the property" of any public utility which is used and required to be used in its services to the public within the State of Kansas whenever the Commission deems the ascertainment of such value necessary in order to enable the Commission to fix fair and reasonable rates. K.S.A. 66-128a provides that nothing in K.S.A. 66-128b through 66-128i shall be construed to limit the authority of the KCC to review and evaluate the efficiency or prudence of any actions, including acquisition of excess capacity, or operating practices of any public utility for the purpose of establishing fair and reasonable rates. K.S.A. 66-128b provides that the KCC may require a public utility to defer the inclusion of all or any portion of the reasonable value of property determined not currently used and required to be used for public service and may require the phase-in of such value over any period of time and in such increments as it may determine to be appropriate.

K.S.A. 66-128c provides that the KCC, in determining the reasonable value of property under 66-128, shall have the power to evaluate the efficiency *or* prudence of acquisition, construction, or operating practices of that utility. In the event the KCC determines that a portion of the costs of acquisition, construction, or operation were incurred due in whole or in part to a lack of efficiency or prudence, or were incurred in the acquisition or construction of excess capacity, the Commission shall have the power and authority to exclude those portions of the costs from the revenue requested by the utility. This section defines "excess capacity" to mean any capacity in excess of the amount used

and required to be used to provide adequate and reliable service to the public within the State of Kansas as determined by the Commission. The Commission is empowered, within its discretion, to prohibit or reduce the return on all costs which were incurred in constructing, maintaining or operating excess capacity.

K.S.A. 66-128e authorizes the KCC to exclude from the value of utility property for rate-making purposes that portion of the costs attributable either to investment in excess capacity which was incurred due to lack of prudence in facility planning or lack of prudence in plant acquisition, construction, or operation. However, a finding of lack of prudence in capacity planning for a facility which in whole or in part represents excess capacity shall not be made by the KCC when a siting permit authorizing the construction of the facility has been issued under K.S.A. 66-1,162. It should be noted that, in the present case, there was no siting permit issued for the construction of Wolf Creek.

K.S.A. 66-128g is devoted to a recitation of the various factors to be considered by the Commission in making the determination of "prudence" or lack thereof in determining the reasonable value of electric generating property. K.S.A. 66-128g provides as follows:

"66-128g. . . . (a) The factors which shall be considered by the commission in making the determination of 'prudence' or lack thereof in determining the reasonable value of electric generating property, as contemplated by this act shall include without limitation the following:

"(1) A comparison of the existing rates of the utility with rates that would result if the entire cost of the facility were included in the rate base for that facility;

"(2) a comparison of the rates of any other utility in the state which has no ownership interest in the facility under consideration with the rates that would result if the entire cost of the facility were included in the rate base;

"(3) a comparison of the final cost of the facility under consideration to the final cost of other facilities constructed within a reasonable time before or after construction of the facility under consideration;

"(4) a comparison of the original cost estimates made by the owners of the facility under consideration with the final cost of such facility;

"(5) the ability of the owners of the facility under consideration to sell on the competitive wholesale or other market electrical power generated by such facility if the rates for such power were determined by inclusion of the entire cost of the facility in the rate base;

"(6) a comparison of any overruns in the construction cost of the facility under consideration with any cost overruns of any other electric generating facility constructed within a reasonable time before or after construction of the facility under consideration;

"(7) whether the utility having an ownership interest in the facility being considered has provided a method to ensure that the cost of any decommissioning, any waste disposal or any cost of clean-up of any incident in construction or operation of such facility is to be paid by the utility;

"(8) inappropriate or poor management decisions in construction or operation of the facility being considered;

"(9) whether inclusion of all or any part of the cost of construction of the facility under consideration, and the resulting rates of the utility therefrom, would have an adverse economic impact upon the people of Kansas;

"(10) whether the utility acted in the general public interest in management decisions in the acquisition, construction or operation of the facility;

"(11) whether the utility accepted risks in the construction of the facility which were inappropriate to the general public interest to Kansas;

"(12) any other fact, factor or relationship which may indicate prudence or lack thereof as that term is commonly used.

"(b) The portion of the cost of a plant or facility which exceeds 200% of the 'original cost estimate' thereof shall be presumed to have been incurred due to a lack of prudence. The commission may include any or all of the portion of cost in excess of 200% of the 'original cost estimate' if the commission finds by a preponderance of the evidence that such costs were prudently incurred. As used in this act 'original cost estimate' means:

"(1) For property of an electric utility which has been constructed without obtaining an advance permit under K.S.A. 60-1,159 *et seq.*, and amendments thereto, the 'definitive estimate'; and

"(2) for property of an electric utility which has been constructed after obtaining an advance permit under K.S.A. 66-1,159 *et seq.*, and amendments thereto, the cost estimate made by the utility in the process of obtaining the advance permit."

The other provisions enacted in 1984 are not material in this case and need not be mentioned.

In 1985, the legislature adopted additional statutory amendments to clarify the Commission's authority, power, and jurisdiction to supervise and control public utilities. See K.S.A. 66-101 through 66-101h. These various statutes grant to the KCC broad authority to do all things necessary and convenient for the establishment of just and reasonable rates in order to maintain reasonably sufficient and efficient service from electric public utilities. The Commission is given powers to investigate and to hold hearings. K.S.A. 66-101g declares that the statutory powers shall be liberally construed, and all incidental powers necessary to carry into effect the provisions of the act are expressly granted to and conferred upon the Commission. It should be noted that all of these statutory amendments passed in 1984 and 1985 were in full force and effect at the time the KCC orders were entered in the three cases now before us on this appeal.

In their briefs, the utilities challenge the constitutionality of these statutes for a variety of reasons. They argue that K.S.A. 66-128 *et seq.* are unconstitutionally vague because an ordinary person exercising ordinary common sense could not understand their provisions. We find no merit to this contention. The thrust of the KCPL argument claiming vagueness is that "prudence" is not defined anywhere in the statutes. In our judgment, the statutory provisions are as definite and clear as reasonably could be expected in a statute of this type. The Kansas statutory provisions are much more definite and certain than statutes involving the same subject matter found in other jurisdictions. We also note that K.S.A. 66-128g(12), in effect, states that "prudence or lack thereof" means as that term is commonly used. Black's Law Dictionary 1104 (5th ed. 1979) defines "prudence" as "[c]arefulness, precaution, attentiveness and good judgment."

The utilities also attack K.S.A. 66-128 *et seq.* as an unlawful delegation of legislative authority because the statutory provisions do not contain reasonably clear standards to control the KCC in the exercise of its authority. It is well established in Kansas that a delegation of legislative authority to an administrative body must fix a reasonably clear standard which governs the exercise of that authority. *State, ex rel., v. Fadely,* 180 Kan. 652, 308 P.2d 537 (1957); *State, ex rel., v. Hines,* 163 Kan. 300, 182 P.2d 865 (1947).

In this case, the statutes enacted in 1984 and 1985 authorize the Commission to apply certain prescribed standards and requirements in setting the rates for the various utilities. The KCC's expertise in the field is vast, and the Commission must, of necessity, have considerable discretion in order to regulate utilities in the public interest. The statutes also contain a protection against arbitrary action by the KCC. The KCC is required to state expressly its findings of fact and conclusions of law. Such a provision prevents arbitrary action and facilitates judicial review, thus insuring a lawful exercise of legislative authority.

One other matter should be noted in regard to the determination of rate-making cases. In arriving at its decision, the KCC, of necessity, must be afforded a wide discretion in the methodology to be utilized in approaching the complex problems involved. The field of public utility regulation is a highly complex field and requires a great amount of expertise in arriving at a result which is fair and just to all interested parties.

In *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, Syl. ¶ 3, we find the following language:

"A public utility has no vested right in any one particular formula or method, and the State Corporation Commission is not bound to use any particular formula, or combination of formulae, in valuing a public utility's property for rate making purposes. The State Corporation Commission should receive and consider all evidence which has a relevant bearing on reasonable value and then determine what formula, or combination of formulae, it believes should be used under the facts and circumstances of the case to arrive at a reasonable value of the property for rate making purposes."

See also *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. 505, 512, 561 P.2d 779 (1977).

### Scope of Review

We should next consider the scope of judicial review where an appeal is taken to the courts from an order of the KCC in a rate-making case. The scope of review is discussed in the decision of the Court of Appeals in *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 380-81, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979), where the court stated:

"K.S.A. 1978 Supp. 66-118d limits judicial review of an order by the commission to determining whether the order is 'lawful' or 'reasonable.' *Kansas Gas & Electric Co. v. State Corporation Commission,* 218 Kan. 670, Syl. ¶ 1, 544 P.2d 1396 (1976). A court has no power to set aside such an order unless it finds that the commission acted unlawfully or unreasonably. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, 396-7, 565 P.2d 597 (1977). An order is 'lawful' if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. 505, Syl. ¶ 1, 561 P.2d 779 (1977). An order is generally considered 'reasonable' if it is based on substantial competent evidence. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, Syl. ¶ 2.

"The legislature has vested the commission with wide discretion and its findings have a presumption of validity on review. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. at 511. Since discretionary authority has been delegated to the commission, not to the courts, the power of review does not give the courts authority to substitute their judgment for that of the commission. *Central Kansas Power Co. v. State Corporation Commission,* 206 Kan. 670, 675, 482 P.2d 1 (1971). The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into fixing utility rates. It is aided by a staff of assistants with experience as statisticians, accountants and engineers, while courts have no comparable facilities for making the necessary determinations. *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 48-9, 386 P.2d 515 (1963). Hence a court

■■■■■■■■■■■■■■■■

may not set aside an order of the commission merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it. *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 617, 538 P.2d 702 (1975); *Graves Truck Line, Inc. v. State Corporation Commission,* 215 Kan. 565, Syl. ¶ 5, 527 P.2d 1065 (1974)."

These same rules were recognized in *Ash Grove Cement Co. v. Kansas Corporation Commission,* 8 Kan. App. 2d 128, 650 P.2d 747 (1982), and also by this court in *Oilfield Fluid Motor Carriers v. Kansas Corporation Comm'n,* 234 Kan. 983, 986, 677 P.2d 982 (1984).

In 1984, the Kansas legislature codified these principles when it enacted the "Act for Judicial Review and Civil Enforcement of Agency Actions" contained in K.S.A. 77-601 through 77-627. K.S.A. 77-603 makes the act applicable to all agencies not specifically exempted by statute. K.S.A. 77-621 specifically sets forth the scope of review of administrative decisions by the courts and provides as follows:

"**77-621. Scope of review.** (a) Except to the extent that this act or another statute provides otherwise:

"(1) The burden of proving the invalidity of agency action is on the party asserting invalidity; and

"(2) the validity of agency action shall be determined in accordance with the standards of judicial review provided in this section, as applied to the agency action at the time it was taken.

"(b) The court shall make a separate and distinct ruling on each material issue on which the court's decision is based.

"(c) The court shall grant relief only if it determines any one or more of the following:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious.

"(d) In making the foregoing determinations, due account shall be taken by the court of the rule of harmless error."

K.S.A. 66-118a provides that the Court of Appeals shall have exclusive jurisdiction of proceedings for review of an order or decision of the State Corporation Commission arising from a rate hearing when a public utility is a necessary party. Here, the consolidated appeal was transferred from the Court of Appeals to the Supreme Court under the authority of K.S.A. 20-3018(c) and K.S.A. 20-3017.

## Proceedings before the KCC

In 1979, when the problem of rapidly increasing construction costs of Wolf Creek became evident, a docket was created by the KCC for the purpose of initiating a general investigation of the projected costs so that data could be collected for use in rate cases which would be filed after the Wolf Creek facility was completed. In November of 1984, each of the three utilities filed an application requesting proposed rate increases to become effective at the time the Wolf Creek plant went into operation.

The magnitude of the rate increases sought was unprecedented in Kansas. KCPL suggested a phase-in of the increased rates over a four-year period. The first-year increase requested was in the amount of $45.3 million, a 25% increase. Over the phase-in period, a total increase of $110.6 million was sought for a 65% increase over current rates. KGE proposed a phase-in proposal seeking a 40% increase in the amount of $144.9 million in 1985 and four subsequent annual increases for a total of $373 million. The percentage increase in rates at the end of the phase-in period for KGE would be 106%, as opposed to a one-time 95% increase. KEPCo sought a 40% increase in its rates in the amount of $26.9 million annually.

In requesting the proposed rate increases, the utilities sought to recover their shares of various expenses for Wolf Creek, including operations and maintenance, fuel, and annual funding for decommissioning of the plant. Furthermore, the companies sought a return of the total construction costs of the Wolf Creek plant through annual depreciation expenses and, in addition, a return on the costs of construction at an overall rate of return.

The KCC held hearings on the applications for rate increases during the months of May, June, and July of 1985. The Commis-

sion heard the testimony of over 160 technical witnesses and admitted several hundred exhibits. The 58-volume transcript covers 17,830 pages. The Commission held 19 public hearings at various places in the companies' service territories, hearing the testimony of 475 ratepayers. Briefs were then submitted to the KCC by counsel for the utilities, the Commission staff, and various intervenors. On September 27, 1985, the KCC issued its order granting in part and denying in part the rate increases requested by the utilities. Motions for a rehearing were filed and heard. The original orders of the KCC were modified in certain respects and the balance of the motions were denied in November 1985. The utilities sought judicial review of the orders of the KCC in the Court of Appeals. The cases were subsequently transferred to the Kansas Supreme Court and consolidated into one appeal.

The overall effect of the KCC orders may be summarized as follows:

(1) The utilities received virtually all they requested as expenses to operate and maintain the plant and to decommission it at the end of its life.

(2) The KCC determined that a total of $183 million, or about 10% of the costs of construction of the Wolf Creek plant, was inefficiently and imprudently incurred. The utilities were denied both a recovery *of* and a return *on* that portion of the costs of the construction.

(3) The KCC allowed all of the remaining 90% of the Wolf Creek construction costs to be recovered through annual depreciation expenses over the expected life of the plant.

(4) Of that 90%, no current return or profit was permitted on approximately $944 million on the basis that a portion of the costs constituted excess physical capacity, because it was not used and required to be used to provide current services to the ratepayers. The disallowance for the excess physical capacity was allocated in the amount of approximately $716 million to the rate base of KGE and $228 million to the rate base of KCPL. As to KEPCo, the KCC found that it did not have excess physical capacity and, therefore, no deduction from its rate base was required. The excluded amounts will remain eligible in the future for a rate of return as the excess capacity is utilized to serve the ratepayers.

(5) Of the remaining 90% of capital costs which were held to be prudently incurred, the KCC disallowed the sum of approximately $266 million on the basis that it constituted excess economic capacity. The disallowance for excess economic capacity was allocated to reduce the rate base of KGE approximately $193 million and to reduce the rate base of KCPL approximately $73 million. No deduction was made for this factor from the rate base of KEPCo. The capital costs on which a return was disallowed were subject to increases in the future, if the economic value increases in comparison with other plants. Thus, the amounts excluded at the time of the order will remain eligible in the future for a rate of return to each utility.

(6) Although, as noted above, no return was allowed on those construction costs found to be imprudent or for the costs found to be excess physical capacity and excess economic capacity, the KGE and KCPL carrying costs will be recovered by being amortized over the life of the plant on a straight-line basis.

Stated simply, the utilities were not and will not be permitted to recover the 10% of the construction costs found to be imprudently incurred. The utilities are permitted to recover all of the 90% of the total construction costs found to be prudently incurred through annual depreciation expense over the expected life of the plant. The KCC set limitations on the right of the utilities to a return *on* that portion of the construction costs found to constitute excess physical capacity and excess economic capacity with the possibility of those costs being included in the rate base at some time in the future.

The three basic areas of dispute in this appeal arise from the deductions of those portions of the construction costs from the rate base of each utility found to be imprudent costs of construction, excess physical capacity, and excess economic capacity.

In connection with these areas of dispute, the utilities have raised many issues of law for the court's consideration. We will discuss each of the basic areas of dispute separately.

Deduction of Imprudent Construction Costs from the Rate Base

The rate-setting approach for the KCC is divided into two phases—revenue required and rate design. By "revenue required" is meant the additional money, if any, that the company needs to meet its obligations and also to have an opportunity to earn a fair profit. Rate design is the process by which the revenue

requirement will be spread over the various classes of customers. That process is not involved in this appeal.

In order to arrive at the revenue requirement, three factors must be carefully analyzed by the KCC:

(1) The rate base;

(2) the operating expenses; and

(3) the percentage rate of return to be applied to the rate base.

The basic issues presented in this case involve the determination of the rate base. The "rate base" may be defined as the dollar amount of a given utility's investment in the plant and property "used and required to be used" in supplying the service that the utility has undertaken to furnish. The rate base is the valuation sought under the provisions of K.S.A. 66-128. The rate base includes items such as the value of generation and transmission facilities and rights-of-way, and equipment of all kinds. Ordinarily, discarded and abandoned property due for retirement is excluded from the rate base. It is the rate base on which the owners of the utilities have a right to earn a fair return. The rate base multiplied by the fair rate of return yields a sum in dollars that the KCC considers reasonable.

There are a number of methods which regulatory agencies use in determining the rate base for a particular utility. The original cost of construction of a facility may be utilized but may be reduced where a portion of the cost is due to imprudence or unjustified expenses. See *San Diego Land & Town Co. v. Jasper*, 189 U.S. 439, 47 L. Ed. 892, 23 S. Ct. 571 (1903). Another method used to establish the rate base is the determination of the fair or reasonable value of the property. K.S.A. 66-128 provides that the KCC shall determine the reasonable value of the property of the utility which is used and required to be used in its services to the public in order to enable the Commission to fix fair and reasonable rates. In *State, ex rel., v. Telephone Co.*, 115 Kan. 236, 261, 223 Pac. 771 (1924), it was held that the original cost is not the measure of the rate base but rather the "going-concern value" of the plant. In *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, as noted heretofore, it was held that the KCC is not bound to use any particular formula, or combination of formulae, in valuing a public utility's property for rate-making purposes. Any evidence having a bearing on reasonable value may be considered, and the KCC may then use any formula

or combination of formulae that it may believe necessary for arriving at a reasonable basis for rate-making purposes.

At the hearing before the KCC, a great deal of expert testimony was presented by the utilities showing that great efficiency and prudence was used by the contractor in the construction of the Wolf Creek plant. To the contrary, the staff of the KCC presented other competent experts who testified that a substantial portion of the construction costs was inefficiently and imprudently incurred. The findings of the KCC set forth this testimony in great detail. It would serve no useful purpose to restate the testimony of the various expert witnesses who testified on behalf of the parties. As noted heretofore, the KCC disallowed a total of approximately $183,000,000 or about 10% of the total cost of construction as costs which were imprudently incurred.

The KCC's disallowance for imprudent construction costs consisted of three distinct quantifications:

(1) $37,961,400 of direct and associated indirect costs attributable to disallowed man-hour overruns;

(2) $244,561,400 of indirect and overhead costs attributable to disallowed schedule delays; and

(3) $450,000 of the fees paid to the primary contractor, Daniel International Corporation, for work which was not performed and which was performed by other contractors.

There is substantial, competent evidence in the record to support the disallowances in each of these categories. There was evidence from which the KCC could reasonably find that KGE and KCPL, as owners of the plant, were imprudent and inefficient in the manner in which they supervised the construction of the plant. We recognize, of course, that there was expert testimony to support findings of both imprudence on the one hand and prudent management control on the other. Perhaps if this court had the obligation and authority to determine this issue, it might have decided it differently. However, because there is substantial, competent evidence in the record to support the findings of the KCC as to imprudent construction costs, we are bound by those findings and cannot substitute our judgment for that of the Commission.

The utilities, however, raise a number of legal issues specifically relating to the finding of imprudent costs. They maintain that the KCC, in determining imprudent costs, applied an un-

reasonable standard of perfection rather than mere prudence, although they recognize that K.S.A. 66-128c afforded the Commission the power to evaluate the construction of Wolf Creek and to exclude construction costs incurred as the result of imprudence or mismanagement. They complain that there is no definition of prudence in the statutes.

In construing statutes, words and phrases should be construed according to context and approved usage of the language, and words in common use are to be given their natural and ordinary meaning. *Jackson v. City of Kansas City,* 235 Kan. 278, 680 P.2d 877 (1984). As noted heretofore in this opinion, the word "prudence" has a common and ordinary meaning. The various factors listed in K.S.A. 66-128g(a) provide sufficient guidelines for determining prudence which obviates the need for a definition of the term.

The utilities complain that the KCC did not accept their evidence consisting of a comparative analysis of the construction costs and schedules at Wolf Creek with similar factors at other nuclear power plants constructed duringthe same period. The KCC rejected this evidence on the basis that the comparative analysis was incomplete, misleading, or irrelevant, and did not support the owners' conclusions. This the KCC had a right to do.

The utilities argue that the KCC used hindsight in determining imprudence rather than considering performance as of the time construction was in progress. This contention is not supported by the record. We hold that the KCC did not determine the issue of imprudence solely on the basis of hindsight, but rather on the basis of substantial, competent evidence.

The owners attack K.S.A. 66-128g(b) as violative of due process because it creates a rebuttable presumption that construction costs of a plant or facility have been incurred due to a lack of prudence as to that portion of the total costs which exceeded 200% of the "original cost estimate." Presumptions may be created by statute if there is a rational connection between the fact proved and the fact presumed. The test in this case is whether a logical inference of management imprudence can be drawn from evidence of total cost greater than 200% of the original cost estimate, or whether there is some justification in public policy for such an inference to be drawn. In our judgment, management imprudence can reasonably be inferred from the

fact a particular project cost exceeded by more than 200% the definitive estimate. Other states by statute have imposed a cap or limitation on the construction costs of nuclear plants. *Re Seabrook Unit No. 1*, 63 P.U.R. 4th 673 (Conn. 1984.) We believe that the presumption is logical in the context of utility regulation, where the ratepayer normally reimburses the utility for its expenses. The fact that there is such a presumption does not determine the issue, for the KCC still has the duty to examine the reasonableness of the construction costs, which is exactly what the KCC did regarding the Wolf Creek costs in this case.

The utilities next maintain that K.S.A. 66-128c only authorizes the KCC to exclude the imprudent costs of construction *from the revenue requested and not from the utility's rate base.* That statute provides, in substance, that the KCC, in determining the *reasonable value of property* under K.S.A. 66-128, shall have the power to evaluate the efficiency or prudence of acquisition, construction or operating practices of that utility. If inefficiency or imprudence is found, the KCC has the right to exclude all or a part of those costs from the revenue requested by the utility. As noted above, it is the rate base which must first be determined before an appropriate return may be allowed by a regulatory agency. The rate base is the major focal point of a rate proceeding. In order for the KCC to reduce a utility's requested revenue increase by costs found to be inefficiently or imprudently incurred, it must, of necessity, reduce the rate base by the amount of the cost disallowance.

In the past, the Kansas courts have held that the exclusion of certain disallowances from the rate base is a discretionary function of the KCC. *Kansas City Power & Light Co. v. KCC*, 224 Kan. 86, 88, 578 P.2d 254 (1978); *Kansas-Nebraska Natural Gas Co. v. Kansas Corporation Commission*, 4 Kan. App. 2d 674, 610 P.2d 121, *rev. denied* 228 Kan. 806 (1980).

KEPCo, in its brief, takes the position that the KCC decision disallowing imprudent construction costs in KEPCo's rate base is unlawful on the basis that the Commission cannot make such a disallowance without finding KEPCo itself to be imprudent. KEPCo argues that the disallowance for imprudent construction costs cannot be attributed to KEPCo, because those cost overruns were imprudently incurred prior to its acquisition of a 6% ownership in the Wolf Creek plant. In its order, the Commission found as follows:

"20. The Commission finds that KEPCo should be held accountable for its proportional share of cost incurrence found to be imprudent notwithstanding the fact that many of the costs found to be imprudent were incurred prior to the purchase of KEPCo's six percent interest in 1981. The record appears clear that KEPCo did not analyze the cause of Wolf Creek cost overruns to determine the reasonableness of incurrence prior to its 1981 purchase of a six percent share. . . .

. . . .

"Having failed to inquire into the reasonableness of Wolf Creek cost incurrence prior to (or subsequent to) its purchase of an interest in Wolf Creek, the Commission finds that imprudence in cost incurrence prior to the purchase of KEPCo's interest should be imputed to KEPCo and that KEPCo is responsible for imprudence in cost incurrence subsequent to the purchase of its interest. The Commission finds that KEPCo ratepayers should be shielded from imprudently incurred costs and herein excludes such costs from KEPCo's rate base. The Commission distinguishes imprudently incurred costs which are excluded from rate base from questions of economic loss resulting from excessively expensive capacity. The latter costs are appropriately shared by ratepayers and owners. That objective is achieved in the case of KEPCo by collection of costs through rates."

The Commission disallowed $22,818,000 from KEPCo's rate base. None of the parties have cited a case directly on point. K.S.A. 66-128c expressly provides the Commission with the authority to evaluate the efficiency or prudence of *acquisition* as well as construction practices of that utility in disallowing imprudent costs.

In the present case, the Commission found that KEPCo failed to analyze the causes or determine the reasonableness of the Wolf Creek cost overruns prior to its *acquisition* or purchase of Wolf Creek in 1981. Thus, we believe that it was within the Commission's power to disallow those amounts of overruns from KEPCo's rate base. Furthermore, if a portion of the cost of construction was imprudently incurred, that situation would not be changed simply because KEPCo purchased a share of the plant at a later time. KEPCo is not in the position of a *bona fide* purchaser for value. It takes its share of ownership in the plant subject to any imprudent construction disallowance.

The KCC's duty was to determine the fair value of the plant. In so doing, it had the authority to eliminate those portions of the construction costs which were inefficiently or imprudently incurred. The KCC requested KEPCo to come up with a plan to take care of any financial problems caused by its order by means

of a surcharge or otherwise. In our judgment, the KCC had the power to handle the matter in that way. Although the parties apparently agree that KEPCo's shareholders and ratepayers are the same people, we will leave it up to the future determinations of the KCC as to the appropriate action required to solve any problems that might remain. KEPCo may still appeal any later order it deems unlawful or otherwise improper.

We have considered all of the contentions of the utilities and the evidence in the record in this case and have concluded that the KCC's disallowance of those construction costs it found to have been imprudently incurred was supported by substantial, competent evidence, was within the statutory powers of the KCC, and was neither unlawful, arbitrary, nor capricious.

## Deduction of Excess Physical Capacity from the Rate Base

The KCC, in its order, found that approximately $944,000,000 of the prudent construction costs should be excluded from the rate base for the reason that a portion of these costs constituted excess physical capacity, because part of the plant was not "used or required to be used" to provide current services to the ratepayers. This disallowance for excess physical capacity was allocated in the amount of approximately $716,000,000 to the rate base of KGE and $228,000,000 to the rate base of KCPL. No deduction was made from the rate base of KEPCo. KGE and KCPL maintain that this order of the KCC was unreasonable and unlawful.

The cases in this field hold that a utility is not necessarily entitled to a return and profit on its investment in a new generating plant simply because it acted prudently in deciding to build and in actually constructing the plant. It is the usual practice for a state regulatory commission to inquire whether a new plant is "used and useful in rendering service to the public." The Kansas statutes enacted in 1984 varied this test slightly. K.S.A. 66-128 requires the KCC to determine the reasonable value of all or *whatever fraction or percentage of the property* of any public utility which is "used and required to be used" in its service to the public within the State of Kansas.

K.S.A. 66-128c defines "excess capacity" to mean any capacity in excess of the "amount used and required to be used" to provide adequate and reliable service to the public. The KCC is authorized in its discretion to prohibit or reduce the return costs

incurred in constructing, maintaining, or operating excess capacity. K.S.A. 66-128b authorizes the Commission to require a public utility to defer inclusion of the reasonable value of property determined to be not currently used and required to be used and may require the phase-in of such value over any period of time or in such increments as it deems to be appropriate.

Other state regulatory commissions have reached similar results under the simpler and more traditional "used and useful" test by determining: (1) Whether the utility has constructed excess capacity; (2) what effect such excess capacity should have on the calculations of the revenue requirement; and (3) which plants to exclude from the rate base in the event of excludable excess capacity. The statutory provisions for excluding excess capacity are intended to prohibit a utility from earning a return on an investment which is not being used to accomplish the utility's ultimate goal of providing services to its customers.

In determining the excess physical capacity of Wolf Creek in this case, the KCC stated that the factors to be considered are: (1) Peak demand or responsibility, (2) reserve margin, and (3) available capacity. In determining available capacity, the Commission used the companies' accredited capacity figures. The Commission also found certain generation facilities were available for use even though the companies claimed such facilities had been retired, including KCPL's Hawthorn Units 1 and 2.

The Commission ultimately found that 327 megawatts (MW) of KGE's available capacity and 314 MW of KCPL's available capacity were not used and required to be used and thus constituted excess physical capacity. It must be emphasized again that the KCC did allow a full recovery of those costs through depreciation. The KCC denied KGE and KCPL only a return or profit on those costs. The KCC also recognized that inclusion in the rate of such costs or a portion thereof would be subject to future KCC orders as more of Wolf Creek became used and required to be used.

The KCC recognized that, in determining excess capacity, electric utilities must be permitted to plan for the future and that it would be ridiculous to construct generating plants only when the need arises and without anticipating future growth. *Kansas Gas & Electric Co. v. State Corporation Commission,* 218 Kan. 670, 677, 544 P.2d 1396 (1976). The KCC selected the year 1990

as the reference year, allowing for five years of projected growth in peak demand from 1985, when Wolf Creek was to commence its operations. The KCC thus set a five-year period for a planning horizon or load forecast.

The KCC also determined the reserve margins for each utility sufficient to cover any day-to-day variations in operating conditions. All utilities must have some reserve capacity to protect against shortages caused by occasional plant shutdowns. The utility should be able to recover investments in, and a profit on, that reserve capacity. The problem is to establish a reserve margin that is high enough to provide reliable and adequate service, but not so high that customers are charged for unnecessary plant capacity. The expert witnesses suggested that a 15% to 25% reserve margin was required. The KCC considered the testimony of the various experts and found that a reserve margin of 20% was justified.

The utilities maintain that the Commission did not apply proper legal standards in determining excess capacity. We find this contention to be without merit. The standards applied were those required by the 1984 Kansas statutes discussed above.

The utilities contend that the Commission arbitrarily, unreasonably, and erroneously chose the year 1990 to calculate the owners' system capacity balances. In its findings, the Commission noted that the selection of a reference year was difficult, because no witnesses had proposed standards for selection of a reference year. We cannot say that the selection of 1990 was arbitrary. It provided a five-year planning horizon perspective which is reasonable. We hold that the selection of the reference year of 1990 was not arbitrary. This is especially true because the Commission, in its order, recognized that if there were changes in the demand for electricity in the years to come, the owners could seek the Commission's approval to include more of Wolf Creek in the rate base.

Likewise, the contention of the utilities that the Commission's peak demand forecast did not consider any possible increase in the demand for electricity generated by lower rates is not persuasive. If future power demands exceed the KCC's forecast because of price elasticity, the utilities may request another hearing before the Commission.

KCPL maintains that the Commission's inclusion of 41 MW of

purchased power in KCPL's available capacity while excluding all purchased power in determining KEPCo's available capacity is a denial of equal protection of the law. The Commission took the position that KEPCo is not similarly situated with KGE and KCPL. Prior to Wolf Creek, the operations of KEPCo were totally reliant on purchased power to meet their load requirements. KEPCo elected to become an owner of a share of the electric generating plant at Wolf Creek rather than remaining a wholesaler of electricity. KEPCo is different from the other two utilities because KEPCo is an electric cooperative, not a shareholder utility. The difference is discussed in *Sekan Electric Coop. Ass'n v. Kansas Corporation Commission,* 4 Kan. App. 2d 477, 609 P.2d 188 (1980), where an electric cooperative was treated differently from an investor-owned utility in regard to "equity returned capital." The court pointed out that a cooperative does not secure equity by stock offerings in the marketplace and a return large enough to pay dividends is not required to attract equity capital or to make a cooperative financially sound.

KEPCo is a nonprofit generating and transmitting wholesale distributor of electricity to its member rural electric cooperatives. The shareholders or stockholders are the ratepayers. The record shows that KEPCo was required to purchase a portion of the electricity transmitted to obtain the lines to get the electricity to its customers. KEPCo and the other utilities are not similarly situated and we cannot say that the Commission's order violated KCPL's right to equal protection.

KCPL contends that the Commission erroneously included KCPL's Hawthorn Units 1 and 2 in determining that utility's available capacity because those units have been retired from service. The addition of those units added an additional 130 MWs to KCPL's available capacity in 1990. The evidence presented by KCPL showed that Hawthorn Units 1 and 2 are fossil fuel-fired plants placed in inactive reserve by KCPL in 1984 and retired on December 31, 1984, but they could be rehabilitated in the future, if an additional need for electricity arose. The Commission found that the units were retired only in an accounting sense and were "retired" long before the previously scheduled retirement dates of 1991, which would correspond with a normal 40-year life for fossil fuel steam plants. Furthermore, although the evidence regarding Hawthorn Units 3 and 4 was similar, the

Commission did not include them in the available capacity. We have concluded that the Commission acted reasonably and considered the interests of all parties in arriving at its decision.

KGE complains that the finding of the Commission that a portion of Wolf Creek is excess capacity is unreasonable because Wolf Creek replaced the older KGE gas/oil units, which Wolf Creek was constructed to and did displace. We find no merit to this contention. It was the construction of Wolf Creek that created the excess capacity. A regulatory Commission has broad discretion to determine which plant constitutes excess capacity. Furthermore, as older units become so obsolete that their retirement is necessary, that fact will be reflected in future orders of the Commission.

We have considered all of the legal issues raised by the utilities and considered the record as a whole. We have concluded that there is substantial, competent evidence to support the findings of the KCC in determining excess physcial capacity, and that the Commission followed the statutory standards and exercised its discretion in a lawful manner.

Deduction of Excess Economic Capacity from the Rate Base

After determining that disallowances from the rate base should be made for imprudent construction costs and excess physical capacity, the Commission concluded that an economic evaluation of Wolf Creek was necessary. The Commission was impressed by testimony that, apart from whether excess physical capacity exists, a nuclear plant may represent capacity which is not economical because it has excessive capital costs when compared to alternative types of generating facilities.

The Commission found from the evidence that Wolf Creek was an extraordinarily expensive means of providing electric generating capacity. It valued Wolf Creek at a cost of $1290 per KW, which included an allowance for the lower operational costs of Wolf Creek compared to coal plants. The Commission considered the costs of construction of a coal generating plant as a benchmark for its evaluation because the greater capital costs for the Wolf Creek nuclear facility were of doubtful economic benefit to the ratepayers. The Commission concluded that no profit or return on that economically inefficient excess should be allowed KGE and KCPL. However, as part of an overall risk-sharing approach, the Commission did allow total recovery of

those costs through depreciation. Because the KEPCo share-holders are the same people as the ratepayers, the Commission found that risk sharing was accomplished without an explicit exclusion from KEPCo's rate base.

In determining that there should be a disallowance from the rate bases of KGE and KCPL for excess economic capacity, the Commission balanced the interests of the utility investors with the interests of the ratepayers. In doing so, it used a risk-sharing approach. In *Kansas Gas & Electric Co. v. State Corporation Commission,* 218 Kan. at 674, this court stated that, in fixing the rates of an electrical utility under K.S.A. 66-128, the Commission has a two-phase duty in determining the rate base:

(1) To determine the property of a utility used or required to be used in its services to the public, and

(2) to ascertain the reasonable value of such property when-ever it deems the ascertainment of such value is necessary to fix fair and reasonable rates. K.S.A. 66-128 was amended in 1984 to authorize the Commission to determine the fraction or percent-age of a facility that is used and required to be used.

Under K.S.A. 66-128c, the Commission is empowered to eval-uate the efficiency or prudence of acquisition, construction, or operation of a utility. One of the factors to be considered for determination of the reasonable value of electric generating property set forth in K.S.A. 66-128g is factor No. 11, which requires the Commission to consider whether the utility ac-cepted risks in the construction of the facility which were inap-propriate to the general public interest to Kansas. This is obvi-ously a legislative recognition of the risk-sharing approach.

In using the risk-sharing approach to arrive at the reasonable value of Wolf Creek, the Commission looked to the factors in K.S.A. 66-128g(a) and discussed the evaluation with respect to (1) the owners' decision to build and continue Wolf Creek; (2) the economic impact and rate comparisons; and (3) the risk assump-tions and sharing which included a finding that the owners accepted enormous risks in building Wolf Creek.

The utilities contend, in substance, that the Commission erred in applying its risk-sharing approach and that it should have evaluated Wolf Creek at its actual prudent cost without consid-eration of the impact of the proposed rate increases on the ratepayers and the general public. The balancing of the rights of

the investors and ratepayers and consideration of risk sharing is not a new procedure in Kansas. In *Kansas Power & Light Co. v. Kansas Corporation Commission*, 5 Kan. App. 2d 514, 525-29, 620 P.2d 329 (1980), *rev. denied* 229 Kan. 670 (1981), the Court of Appeals addressed the Commission's treatment of a KP&L gain on the sale of its office building in Salina. KP&L treated the gain as outside its accounts for rate-making purposes. The Commission treated the gain as appropriate for rate making and allowed the gain to flow through to the ratepayers. The court recognized the balancing of gains and losses between ratepayers and stockholders and mentioned the risk of loss of investment capital as a factor to be considered.

In *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 389 P.2d 515 (1963), which is discussed earlier in the opinion, this court recognized that the Commission should receive and consider any evidence which has a relevant bearing on reasonable value and then determine what formula, or combination of formulae, it believes should be used under the facts and circumstances of the case to arrive at a reasonable value of the property for rate-making purposes.

There are cases in other jurisdictions which hold that the present fair value of generating facilities cannot exceed the present cost of constructing a *substitute* system of modern design, capable of generating and distributing the same quantity of power at less operating expense. See *Utilities Comm. v. Power Co.*, 285 N.C. 377, 206 S.E.2d 269 (1974). In *Utilities Comm. v. Power Co.*, 285 N.C. 398, 206 S.E.2d 283 (1974), the court stated that neither original cost nor replacement cost are a measure of fair value but only indicators thereof. The term "just and reasonable rates" imports flexibility in the exercise of a complicated regulatory function by a specialized decision-making body and this was not intended to confine the ambit of regulatory discretion to an absolute or mathematical formula but rather to confer on the regulatory authority the power to make and apply policy concerning the appropriate balance between prices charged to utility customers and returns on capital to utility investors consonant with constitutional protections applicable to both. *Pennsylvania, etc. v. Pennsylvania Gas*, 492 Pa. 326, 337, 424 A.2d 1213 (1980), *cert. denied* 454 U.S. 824 (1981).

The Commission referred to other jurisdictions which have

recognized "risk sharing" as a valid approach to the problem of excess capacity and cancelled plant situations. *Iowa Planners Net. v. Iowa State Commerce,* 373 N.W.2d 106, 110 (Iowa 1985); *Phila. Electric Co. v. Pa. P.U.C.,* 61 Pa. Commw. 325, 433 A.2d 620 (1981); *Re Carolina Power and Light Co.,* 49 P.U.R. 4th 188 (N.C. 1982); *Re Otter Tail Power Co.,* 44 P.U.R. 4th 219 (N.D. 1981). See, *Re Nine Mile Point No. 2 Nuclear Station,* 62 P.U.R. 4th 455 (N.Y. 1984); and Colton, *Excess Capacity: Who Gets the Charge from the Power Plant?,* 34 Hastings L. J. 1133, 1146-49 (1983), where the Commission applied risk sharing to capital costs which exceeded construction costs.

The utilities raise a number of legal issues attacking the disallowance for excess economic capacity. They maintain that the imposition of a reasonable value methodology after Wolf Creek was already constructed and placed into service would deny the utilities a fair opportunity to earn a fair return on their investment. They question the sufficiency of the evidence to support the findings of the Commission. We find these contentions to be without merit. In our judgment, the statutory provisions adopted in 1984, coupled with the prior decisions of the Kansas courts, gave to the KCC a broad authority to evaluate the Wolf Creek generating plant, including the use of the risk-sharing approach in determining excess economic capacity.

The utilities argue that the Commission's use of a reasonable value methodology was invalid because it denied recovery of expenses actually incurred which were necessary to comply with safety regulations of the NRC. In this case, the utilities were allowed to recover all of the costs of Wolf Creek except the disallowance for imprudent costs. The Commission simply denied the utilities a return on that portion of Wolf Creek which represented physical or economic excess capacity. Thus, the amount of the Wolf Creek costs that resulted from compliance with NRC safety requirements are to be recovered by the utilities. Furthermore, the utilities' argument that the orders of the KCC interfere with safety regulations of the NRC has been rejected by the United States Supreme Court. In *Pacific Gas & Elec. v. Energy Resources Comm'n,* 461 U.S. 190, 75 L. Ed. 2d 752, 103 S. Ct. 1713 (1983), the United States Supreme Court stated that although Congress intended that the federal government should regulate the radiological safety aspects involved in

the construction and operation of nuclear plants, the states retain their traditional responsibility in the field of regulating electrical utilities for determining questions of need, reliability, cost, and other related state concerns. The determination of the rate base by the Commission in this case does not in any way encroach on the power of the NRC to establish and regulate the safety requirements of nuclear plants.

The utilities also complain that the KCC does not have the authority to phase-in the rate increases over a period of five years. We find this contention to be without merit. In the first place, we note that KGE and KCPL requested in their rate application that the KCC phase-in their proposed rate increases. The Commission did just that. Furthermore, K.S.A. 66-128b specifically authorizes the Commission to phase-in "the reasonable value of property determined not currently used or required to be used." The phasing-in of increased rates over a period of time has the effect of balancing the interests of the current ratepayers and the interests of future ratepayers. In addition, phasing-in the value of property as a part of the rate base is a useful tool which the KCC may use in balancing the interests of the investors and the ratepayers.

### KCC's Method of Allocating the KCPL Rate Base and Cost of Services Between Kansas and Missouri

Because of the fact that KCPL provides electrical service to customers in both Kansas and Missouri, that utility has raised an issue regarding the Commission's allocation of the rate base and cost of service between those two states. KCPL contends that the method of allocation used was arbitrary, unconstitutional, unlawful, and confiscatory.

Because of the interstate nature of KCPL's business, the regulatory commissions in both Kansas and Missouri are required to allocate KCPL's operating costs and plant investment between the residents of those states. One commonly used method of allocating a public utility's costs is termed the "coincident peak" or "C.P." method. This method allocates operating costs and plant investment to the jurisdictions actually served by a utility based upon the percentage of total system demand contributed by customers in the serviced jurisdictions during certain periods of time. KCPL took the position that, since the demand of Kansas customers is at its very highest in the four summer months when

air-conditioning usage is at its greatest, the 4 C.P. method should be used in making the allocation. The KCC staff disagreed. Although agreeing that KCPL's total amount of generating capacity may be determined by summer peak cost, it found that total capacity is determined by all twelve months of the year. The staff recommended that the 12 C.P. allocation be used, because it recognized KCPL's capacity requirements throughout all 12 months of the year. The Commission found that the 12 C.P. allocation factor is the most appropriate method of allocating KCPL's production costs and transmission plant value between the jurisdictions because it better recognizes KCPL's investment in base-load facilities used year round and not solely during the summer peak months. We cannot say that the Commission's adoption of the 12 C.P. method was unreasonable or in any way illegal. We note that KGE requested and the Commission adopted the 12 C.P. methodology in connection with the KGE plants. At the time the KCC made its decision, KCPL's case was still pending before the Missouri commission. In the event that consistent methodology is not adopted by Kansas and Missouri, KCPL can make an application to the KCC for relief.

<u>The Reasonableness of the Overall Result</u>

As we stated at the beginning of this opinion, in a rate-making case, the goal of the KCC, as a state regulatory agency, should be to establish a rate within the "zone of reasonableness" after application of a balancing test in which the interests of all concerned parties are considered. In our judgment, the KCC has accomplished that result.

The KCC acted within its statutory powers. The utilities received virtually all of the operating expenses that they requested to operate and maintain the plant and to decommission it at the end of its life. The KCC eliminated approximately 10% of the costs of construction which it found to be inefficiently and imprudently incurred. All of the remaining 90% of the Wolf Creek construction costs are to be recovered through annual depreciation expenses over the life of the plant. It is only the return or profit on certain costs which has been restricted by the Commission. The disallowances for excess physical capacity and excess economic capacity were properly determined by the use of recognized methodology as the Commission proceeded to determine a fair valuation of the Wolf Creek property. The KCC

left the door open for the possibility that portions of the construction costs found to constitute excess physical capacity and excess economic capacity might be included in the rate bases at some time in the future. We find no error in any actions taken or orders entered by the KCC.

The orders of the Kansas Corporation Commission are affirmed.

SCHROEDER, C.J., dissenting: Viewing the "end result" of the orders of the Kansas Corporation Commission (KCC) from the record presented to this court for review, it is readily apparent the orders are unlawful, unreasonable, arbitrary and capricious.

In *Power Comm'n v. Hope Gas Co.*, 320 U.S. 591, 88 L. Ed. 333, 64 S. Ct. 281 (1944), the United States Supreme Court addressed the considerations to be taken into account by the Federal Power Commission in setting "just and reasonable" rates for natural gas companies, as required by sec. 4(a) of the Natural Gas Act of 1938, 15 U.S.C. § 717 (1982). In applying the standard requiring "just and reasonable" rates, the *Hope* court emphasized the focus of inquiry is upon the end result or "total effect" of the rate order, rather than the rate-setting method employed. The court described the rate determination process as a balancing process between the various interests, including the consumer and the investor.

Rates set within the "broad zone of reasonableness" cannot be attacked as confiscatory if, in the balancing test, proper consideration is given the interests of the utilities' investors, the present ratepayers, the future ratepayers, and the public. *Permian Basin Area Rate Cases*, 390 U.S. 747, 770, 20 L. Ed. 2d 312, 88 S. Ct. 1344, *reh. denied* 392 U.S. 917 (1968).

A more detailed examination of these various interests and the law applicable to this case will be discussed later. Of prime importance to my reasoning, which brands the decision of the KCC in this case as arbitrary and confiscatory, are several established facts.

First: Counsel for the KCC *admitted,* in argument of this case before the Kansas Supreme Court, that the initial decision of the utilities to build a nuclear reactor plant at Wolf Creek for the generation of electricity was *not an imprudent decision.* The general nature of the admission concedes the generating capacity of the Wolf Creek plant as planned was reasonable.

Second: In January 1977, the Nuclear Regulatory Commission (NRC), the successor to the Atomic Energy Commission, issued a temporary work authorization permit for the construction of a nuclear facility on Wolf Creek in Coffey County for the generating capacity planned by the utilities.

Third: The KCC determined a total of $183 million, or about 10% of the costs of construction of the Wolf Creek facility attributable to Kansas, was inefficiently and imprudently incurred. On this sum the utilities were denied both a recovery of and a return on that portion of the costs of construction. Without conceding this to be a proper determination, for purposes of my dissent it will be assumed the determination was within the evidence presented and within the discretionary power of the KCC. (The KCC made this determination using perfect hindsight without taking into consideration the information and data available to the utilities when the decisions were made.)

The court in its opinion attributes vast expertise to the KCC to regulate utilities in the public interest. The opinion also states that to guard against arbitrary action the KCC is required to state expressly its findings of fact and conclusions of law. This concession by the court, however, does not warrant the court's abrogating its function of review on appeal as mandated by the legislature. *Kansas Bd. of Regents v. Pittsburg State Univ. Chap. of K-NEA*, 233 Kan. 801, 830, 667 P.2d 306 (1983) (Schroeder, C.J., dissenting).

The historical background and other factual recitations related in the court's opinion will not be restated, and further discussion will proceed on the assumption the reader is familiar with this information. In my opinion, the KCC has simply refused to recognize reality concerning the economic conditions of national scope encountered by the utilities after entering into the contract for construction of the Wolf Creek facility.

Figuratively speaking, the record discloses the KCC, from the time of its initial investigation into the cost overruns at the Wolf Creek plant in 1979, began loading its guns with ammunition for bear to ambush the utilities with the rate orders it eventually entered, after the utilities applied to the KCC to authorize a rate increase.

Legislation was enacted in 1984 (K.S.A. 66-128 through 66-128k) and amended in 1985 (K.S.A. 66-101 *et seq.*). This legisla-

tion was referred to by Robert Vancrum as *The Wolf Creek Excess Cost—Excess Capacity Bill,* 33 Kan. L. Rev. 475 (1985). The legislation is broad in scope and was enacted in anticipation of rate increases from 40% to 110% when the Wolf Creek plant became operational. This legislation *as construed and as applied by the KCC* is unconstitutional. It was enacted seven years after construction of the Wolf Creek facility was begun in 1977. True, it was enacted before the utilities made application for a rate increase, but it was applied to the utilities as a penal statute by the KCC to force a gigantic forfeiture of capital investment. As this legislation was applied, it is arguably an ex post facto law. While the United States constitutional provision (art. 1, sec. 10) prohibiting the enactment of ex post facto laws by the states is applied primarily to criminal enactments, it has also been extended to civil statutes that are penal in nature. The courts look to the purpose of the statute to see if it is punitive or penal. See *Flemming v. Nestor,* 363 U.S. 603, 613-18, 4 L. Ed. 2d 1435, 80 S. Ct. 1367 (1960); *American Power and L. Co. v. Securities and Ex. Com'n,* 141 F.2d 606 (1st Cir. 1944), *aff'd* 329 U.S. 90, 91 L. Ed. 103, 67 S. Ct. 133 (1946); *Dock Watch Hollow Quarry Pit v. Tp. of Warren,* 142 N.J. Super. 103, 361 A.2d 12 (1976), *aff'd* 74 N.J. 312, 377 A.2d 1201 (1977); *Springer v. Whalen,* 68 App. Div. 2d 1011, 415 N.Y.S.2d 106 (1979).

Furthermore, as construed and as applied by the KCC the legislative enactment is confiscatory—violative of the due process clause of the U.S. Constitution. It is the taking of private property for public use without just compensation. *Power Comm'n v. Pipeline Co.,* 315 U.S. 575, 86 L. Ed. 1037, 62 S. Ct. 736 (1942); *Bluefield Co. v. Pub. Serv. Comm.,* 262 U.S. 679, 67 L. Ed. 1176, 43 S. Ct. 675 (1923); *Smyth v. Ames,* 169 U.S. 466, 42 L. Ed. 819, 18 S. Ct. 418 (1898); *Williams v. City of Wichita,* 190 Kan. 317, 341, 374 P.2d 578 (1962) (Schroeder, J., dissenting).

The legislative enactments of 1984 and 1985 pertaining to Wolf Creek need not be held unconstitutional, if there is any way to uphold their constitutional validity. This can be done by construing the legislative enactments to require compliance with *Hope* and other state and federal decisions which mandate that rates set for public utilities fall within the "broad zone of reasonableness" by a balancing process between the various inter-

ests—the interest of the utility investors, the present ratepayers, the future ratepayers, and the public.

Taking into consideration the equation which requires the balancing of the various interests and the three factual considerations heretofore enumerated, what did the KCC do?

It heard the testimony of 479 consumers of electricity; 475 of them were present ratepayers. Their common voice was one of opposition to increased electric utility rates. It is apparent the end result of the KCC order reflects almost a complete disregard of the other interest groups in the equation.

With focus on the major issue in this case, determination of the *rate base* attributed to the Kansas portion of the Wolf Creek facility, how did the KCC accomplish its result? First, the KCC made a deduction of 10% imprudent construction costs from the rate base, for which no income on or recovery of capital is permitted. This forecloses *further penalty for imprudent* management decisions.

Second: The KCC then made a major deduction from the rate base of those construction costs attributable to excess physical capacity. This is a deduction based on all construction costs of the Wolf Creek plant attributable to Kansas over and above the used and useful portion needed for the generation of electricity to supply present and reserve needs which the KCC projected to the 1990 anticipated need. However, to determine excess generating capacity of the Wolf Creek facility the KCC included the electric generating capacity of two Hawthorn fossil fuel plants that had been decommissioned and put in mothballs. The effect of this was to increase the excess capacity of the Wolf Creek facility, which resulted in a larger deduction from the rate base for excess physical capacity. This was done in the face of notification to the utilities in the early 1960s that fossil fuels were being depleted and would eventually become unavailable for the generation of electricity.

Many public utility commissions in other states have made no deduction for excess capacity from the rate base. *Re Iowa-Illinois Gas & E. Co.*, 56 P.U.R. 4th 361 (Ill. 1983); *Re Public Service Co. of Indiana*, 51 P.U.R. 4th 6 (Ind. 1983); *Re Cleveland Electric Illum. Co.*, 46 P.U.R. 4th 63 (Ohio 1982); *Re Pacific Power & Light Co.*, 63 P.U.R. 4th 642 (Or. 1984).

Third: Not content with the end result after the enormous deduction for excess physical capacity from the rate base, the

KCC then made a further enormous deduction from the portion of the Wolf Creek facility attributable to Kansas for what it termed "excess economic capacity." This portion of the Wolf Creek plant costs excluded from the rate base (representing investment in *"excess economic capacity"*) is not warranted because it represents a further deduction from that portion of the plant which the KCC specifically *found to be used and useful.* This additional exclusion from the rate base is simply a double-whammy for "excess capacity."

No cases have been cited to this court, and our research has disclosed none, where any court has upheld an exclusion of excess economic capacity from the rate base similar to what the KCC has done here. State commissions where an attempt was made rejected the deduction of excess economic capacity from the rate base. *Re Washington Water Power Co.,* 60 P.U.R. 4th 503 (Idaho 1984); *Re Union Electric Co.,* 67 P.U.R. 4th 218 (Ill. 1985); *Re Union Electric Co.,* 72 P.U.R. 4th 444 (Iowa 1986).

The method used by the KCC to determine "excess economic capacity" was the unprecedented revaluation of the Wolf Creek facility to generate electricity as a hypothetical coal plant. It compared the cost of generating one megawatt of electricity in a newly constructed hypothetical coal plant to the cost of generating one megawatt of electricity in the Wolf Creek facility based on the construction costs of the Wolf Creek facility. It is conceded electricity generated from a nuclear energy plant requires greater capital investment in the initial construction, but it is much cheaper to operate once the plant is constructed. A coal plant costs less to construct, but it is more expensive to operate.

The KCC refused to permit the utilities in this case to present their evidence that the Wolf Creek facility was the most efficiently built nuclear energy facility in the United States as of the time it was constructed.

The fallacy in the determination made by the KCC to deduct "excess economic capacity" from the rate base is disclosed by an analysis of the reasons for the tremendous increase in construction costs after initial construction began. Approximately 50% of the increased costs encountered by the utilities in constructing the Wolf Creek facility were attributable to changing regulatory safety requirements imposed by the federal Nuclear Regulatory Commission following the Three Mile Island nuclear accident in

Pennsylvania. These costs were not anticipated when construction of the Wolf Creek facility began. There was no way the utilities could avoid these costs imposed by the Nuclear Regulatory Commission. The construction and operation of nuclear power plants has been preempted by federal law in the form of the Atomic Energy Act. In *Northern States Power Company v. State of Minnesota,* 447 F.2d 1143, 1154, (8th Cir. 1971), the court said:

"[W]e hold that the federal government has exclusive authority under the doctrine of pre-emption to regulate the construction and operation of nuclear power plants, which necessarily *includes* regulation of the levels of radioactive effluents discharged from the plant." (Emphasis added.)

The United States Supreme Court in *Pacific Gas & Elec. v. Energy Resources Comm'n,* 461 U.S. 190, 75 L. Ed. 2d 752, 103 S. Ct. 1713 (1983), held broadly that "the Federal Government has occupied the entire field of nuclear safety concerns," and that "the NRC [has] exclusive authority over plant construction and operation." 461 U.S. at 212. Regulation in the field of the traditional state area of utility rate regulation may not stand when, as here, it transgresses upon areas reserved to the federal government. While the KCC is not required to value the Wolf Creek facility at the value requested by the utilities, the KCC must not preclude a return on costs required to comply with federally mandated nuclear safety regulations.

Indirectly, the KCC by deducting from the rate base its determination of "excess economic capacity" has refused to honor the costs attributable to federal preemption.

Obviously, a conflict exists between the KCC's orders and the prior decision of the NRC that the Wolf Creek facility would be needed. Fuel diversity was needed when the Wolf Creek facility was planned.

If the orders of the KCC are upheld in this case, potential owners of future nuclear power plants will choose not to build such plants because they will not be permitted to recover the costs mandated by the federal government's nuclear safety regulations. This prospect clearly stands as an obstacle to the important federal goals found in the Atomic Energy Act of encouraging the development of nuclear power and the goal of encouraging the use of fuels other than oil and natural gas found in the Fuel Use Act.

Directing attention to the admission of the KCC that the initial decision of the utilities to construct the Wolf Creek facility was a prudent decision, it is inconceivable the KCC would not have issued a siting permit for the plant's construction had such permit been required. Where a siting permit has been issued by the KCC, a finding of lack of prudence in capacity planning for a facility which in whole or in part represents excess capacity *shall not be made*. Reasonable action by the KCC should have taken this into consideration. The KCC smugly states in its brief, however, that no siting permit was issued. Furthermore, authorization of the KCC under K.S.A. 66-128e to exclude from value of utility property for rate-making purposes that portion of the costs attributable to investment in excess capacity, which were incurred due to *lack of prudence in facility planning*, has no application in this case. The entire cost of the Wolf Creek facility attributable to Kansas was found to be prudent, except for the 10% found to be imprudent. Findings by the KCC in determining the rate base in this case are clearly inconsistent.

The perfect hindsight approach taken by the KCC to support its orders was taken from the testimony of its expert witness, Dr. Richard A. Rosen.

On cross-examination Dr. Rosen said his research firm was very new to the field of nuclear economics; that it only started to consider nuclear economics in 1980. He testified that everywhere they turned at that time they found a tremendous lack of research. He testified the planning and decision-making process of the utilities concerning the Wolf Creek facility was seriously inadequate and at the end of 1981 the reasonable and prudent course of action for the utilities should have been to abandon the project; that the losses incurred after 1981 should be borne 100% by the shareholders; and that the losses that occurred prior to 1981 should be shared 50-50 between the shareholders and the ratepayers. Actually, abandonment of construction prior to completion of the Wolf Creek project is academic because the project was never abandoned.

Dr. Rosen's statements are amusing because, according to case law, had the project been abandoned the total expenditures for the first five years of construction would have been "sunk costs." That is, the investors would not be permitted to recover either income on or return of their capital investment under the law in

some states. *Citizens Action v. Northern Indiana Public*, 485 N.E.2d 610 (Ind. 1985); *Dayton Power Light Co. v. Pub. Util. Comm.*, 4 Ohio St. 3d '91, 447 N.E.2d 733 (1983).

The specific *after the fact* test proposed by Dr. Rosen violates the well-established rules for determining the prudence of management decision-making. His proposal violates basic tenets of fairness by radically altering the "rules of the game" after the investors' funds have been committed.

Cases relied upon by the KCC to support its deduction of "excess economic capacity" from the rate base and burden the investors with these excess economic costs do not support its action. The KCC contends the investors assumed these risks under its authority to allocate such risk to them. The "risk-sharing" cases cited by the KCC fall into one of four categories, none of which concerns excess economic capacity—abandoned or cancelled plant, plant that is not used and useful, legislative caps on nuclear investment, and plant failure.

The KCC argues the utilities are not denied recovery of capital expenditure on those costs deducted from the rate base for "excess physical capacity" and "excess economic capacity" because the utilities will be permitted to recover these costs by an annual depreciation allowance over the life of the Wolf Creek facility. This is misleading. In the KCC order the following is stated:

"We find that some carrying costs associated with the debt and preferred stock costs of capital should be accrued. Such carrying costs, however, should only be those associated with the portion of Wolf Creek excluded on a physical excess capacity basis valued at the same economic value as the portion included in rate base."

A regulatory body may not arbitrarily use the asserted, lower cost of a fictional facility instead of the historical cost of an actual facility in assigning a value to the facility in question for rate base purposes, particularly where that is done selectively to achieve the lowest possible rate base. The KCC cites no cases whatsoever where the concept of risk sharing, or any other concept, was used to justify hypothetical coal plant revaluation of a nuclear generating facility.

The Iowa State Commerce Commission, upon Union Electric Company's application for a rate increase based on the Callaway nuclear plant in Missouri, was faced with the argument that there were cheaper cost alternatives to a nuclear plant, such as a

coal-fired plant, and only the cost of the lower-cost alternative should be allowed in the rate base. *Re Union Electric Co.*, 72 P.U.R 4th 444, 450 (Iowa 1986). There the Commission responded and held:

"The evidence showed that when the Callaway project was planned in the 1970s, a nuclear plant was a reasonable alternative. Union Electric's choice to 'go nuclear' was prudent when made. Now that a nuclear plant has been completed, Union Electric should be allowed to collect rates consistent with the operation of a *nuclear* plant, rather than some other type of plant. Attributing the cost of an alternate type of generating plant to the Callaway plant is *illogical.*" (Emphasis added.)

See also *In the Matter of the Application of Southern California Edison Company before the Public Utilities Commission of the State of California*, Application 85-05-144 (December 18, 1985), rejecting the question of retroactive "value based" rate making relating to the Palo Verde Nuclear Generating Station.

Without any precedent for its revaluation, the KCC asserts that it has properly allocated to the investors the "risk" that Wolf Creek construction costs would exceed that of a coal plant. But the investors in the Wolf Creek facility did not "assume the risk" of any unprecedented, arbitrary denial of a return on precedent construction costs of used and usable Wolf Creek capacity, merely because they exceeded the construction costs of a coal plant of the same size.

Imputing imprudent construction costs of 10% to KEPCo is, in my opinion, erroneous. KEPCo buys electrical energy at wholesale, having no generating facilities of its own. The lines over which electricity is supplied to the various cooperatives in KEPCo are owned by KG&E. KG&E would not supply electricity to KEPCo unless KEPCo bought into the Wolf Creek facility. Therefore, KEPCo had no choice if it was to continue supplying electricity to its cooperatives. Furthermore, in KEPCo the consumers of electricity are the owners of the Cooperative. Therefore, shifting the risk to the investors is simply shifting the burden to the consumers.

It is respectfully submitted the orders of the KCC should be reversed and the case remanded to the KCC for the establishment of just and reasonable rates.